**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**James IVY, Defendant–Appellant.**

No. 97–6010.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 13, 1998.

Decided Dec. 30, 1998.

Thomas A. Colthurst, Asst. U.S. Attorney (argued and briefed), Veronica F. Coleman (briefed), Office of U.S. Attorney, Memphis, TN, for Plaintiff–Appellee.

Eugene A. Laurenzi (argued and briefed), Agee, Allen, Godwin, Morris, Laurenzi & Hamilton, Memphis, TN, James Ivy, pro se, Federal Correctional Institute, Beaumont, TX, for Defendant–Appellant.

Before: JONES and COLE, Circuit Judges; MARBLEY, District Judge.[*]

MARBLEY, District Judge.

The appellant, James Ivy, convicted in the Western District of Tennessee for cocaine possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1), appeals the denial of his motion to suppress evidence found during a police search of his home. On appeal, Ivy raises two issues: first, whether the district court erred in finding that he consented to the officers' entry into his house; and, second, whether the district court erred in finding that his consent to the police search of his house was given voluntarily. For the reasons stated herein, we **AFFIRM** the district court's judgment that Ivy consented to the police officer's entry into his house, **REVERSE** the district court's judgment that Ivy voluntarily consented to the police search of his house, and **REMAND** for further proceedings consistent with this opinion.

## I. INTRODUCTION

On January 29, 1993, a grand jury in the Western District of Tennessee returned a one count indictment charging James Ivy and Dennis Dunning with possessing forty-nine grams of cocaine base with the intent to distribute in violation of 21 U.S.C. § 841(a)(1). After Ivy failed to appear for an evidentiary hearing scheduled for May 18,

[*] The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

1993, a warrant was issued for his arrest. Ivy was arrested April 23, 1996. On June 17, 1996, a superseding indictment added a second count of failure to appear in violation of 18 U.S.C. § 3146(a)(1).

Ivy moved to suppress the evidence obtained during a police search of his residence, claiming that he did not consent to the officers' entry into his house, and that his consent to the search was not voluntary. After an evidentiary hearing, the magistrate judge found that Ivy voluntarily consented both to the officers' entry and their search of his residence, and recommended denying Ivy's motion. The district court did not conduct its own evidentiary hearing or make its own findings of fact or law, but simply adopted the magistrate's report, and denied Ivy's motion to suppress. Ivy pled guilty to count one of the superseding indictment, reserving the right to appeal his suppression motion. Ivy now appeals the district court's ruling. For the reasons set forth below, we **REVERSE** Ivy's conviction and **REMAND** this case to the district court for further proceedings consistent with this opinion.

## II. FACTS

### A. Undisputed Background

On December 19, 1991, Shelby County Sheriff Department Officer Paul Harvey and two other officers went to a house located at 6706 Silhouette in Memphis, Tennessee, based on information that a fugitive, Desi Arnez Hall, was at that location. At the time, Ivy resided at this address. The officers arrived, knocked on the front door, and Ivy opened it. Officer Harvey asked Ivy if he was Desi Arnez Hall, and Ivy replied that he was not. At this point, the testimony of police officers and defense witnesses diverge.

### B. Police Testimony

According to police witnesses who testified at the suppression hearing, Officer Harvey requested identification from Ivy, and Ivy said that he would have to retrieve it. The officers asked Ivy if he would mind if they came inside. Ivy say "okay," and the officers followed him into the house. There, the officers encountered two other men and a

woman. Officer Harvey asked one of the men, later identified as Dennis Dunning, if he was Desi Arnez Hall and Dunning answered he was not. Officer Harvey asked Dunning for identification, which Dunning stated was in his car. The officer asked him to retrieve it. Dunning then fled, running out of the back door of the house. The officers pursued Dunning and caught him in the back yard as he attempted to jump over a fence, and subdued him after a struggle. Pieces of crack cocaine fell out of Dunning's pockets during the skirmish.

The officers brought Dunning back into the house. Officer Holloway meanwhile had "secured" the other occupants. In walking back through the house, Officer Harvey found a small quantity of crack cocaine on the floor. He then called for additional officers from the Narcotics Unit.

Sergeant Jackie Setliff and Officer Roger Swatzena arrived some time later. An officer advised Ivy and the other individuals at the house, including Ivy's girlfriend, Tina Jones, of their rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Sergeant Setliff then spoke to Ivy and requested his consent to search the house. Ivy did not respond to this request, but asked the sergeant what would happen if he did not consent. Setliff replied that he would attempt to obtain a search warrant. Ivy remained unresponsive. Setliff suspended his conversation with Ivy to attend to other tasks, and resumed the conversation ten minutes later. The sergeant asked Ivy if he had changed his mind, and when Ivy again did not respond, Setliff contacted his office to make arrangements to obtain a search warrant. A few minutes after this telephone call, Ivy informed the officer that he would provide his consent and signed the consent form. During the entire time that Sergeant Setliff questioned Ivy, Ivy's girlfriend, Tina Jones, was handcuffed to a table, attempting to care for their infant child.

After Ivy signed the consent form, the police searched the house. In a bedroom, Officer Harvey found a small quantity of crack cocaine in a dresser drawer and approximately $5500 in cash in a night stand. Sergeant Setliff found a set of triple beam

scales in one of the bedrooms. Additionally, the police found in a drawer in the kitchen several guns and a cooking tube containing cocaine residue. Based on this evidence, the officers arrested Ivy.

### C. Defense Witnesses' Testimony

According to Ivy and Jones' testimony at the suppression hearing, Officer Harvey did not simply ask Ivy for identification, but rather used physical force to gain entrance. Officer Harvey shoved Ivy against an interior wall, forced his arm behind his back, and demanded some identification.

Further, Ivy maintained, a full hour and a half passed between the initial request for consent and his signing the consent form. During this time, Jones was handcuffed to the kitchen table by her legs, and at points Officer Holloway took Jones' child from her. Ivy testified that when he first refused to sign the consent form, Sergeant Setliff said "I could be a man about it and sign the consent and let my wife, my fiancee and baby go or I could let them go to jail with me or I could be a fool and let everybody in the house go to jail." After Ivy initially refused, Sergeant Setliff asked Jones to sign a consent to search form. When she also declined to do so, Jones testified, the sergeant told her that refusal to sign would mean the police would take her child away, that she would no longer be able to see the child and that she would go to jail.

Immediately after Jones' refusal, the police asked Ivy for a second time to sign the consent form. Again, he refused. Ivy testified that Sergeant Setliff responded that he would obtain a search warrant regardless of Ivy's consent and that "I could be a man about it and just release them and let them not go to jail or I could just be a fool and let everybody go to jail." Finally, upon the police's third request, Ivy acquiesced and signed the form.

### III. THE DISTRICT COURT'S RULING AND ISSUES PRESENTED

In its finding of facts, the district court essentially accepted the police version of events, and ruled that the evidence obtained in the search of Ivy's house should not be suppressed. The district court, adopting the magistrate judge's report, found that Ivy and Jones were not credible witnesses. It concluded:

> [T]he testimony of Officer Harvey is more credible than that of the defendant James Ivy. Officer Harvey and his fellow patrolman were not at the house to look for drugs. They were there to locate Desi Arnez Hall, and did not know whether defendant was Hall or not. There was therefore no incentive for them to enter the house, except to protect themselves and to make sure defendant did not run out the back. At the evidentiary hearing, defendant testified that the $5,500.00 to $5,600.00 found by officers in a night stand in one of the bedrooms was money he and his girl friend had saved, and that he kept it under the night stand to keep it safe from burglars. This is such an incredible story ... that it taints defendant's credibility in general.

Based on this finding of the relative credibility of the witnesses, the district court adopted the police version of events with regard to Ivy's consent in allowing the officers to enter his house. The district court held "defendant did in fact invite Officer Harvey and his partner into the house, as Harvey testified."

Similarly, the district court concluded that Ivy's consent to search the house was given voluntarily. The court explained:

> Sergeant Setliff then went to defendant James Ivy and asked him if he would sign a "consent to search" the premises at 6706 Silhouette. Defendant made no response, and Sgt. Setliff went about doing other things. About five (5) to ten (10) minutes later, Sgt. Setliff again asked defendant if he would sign a "consent to search."
>
> There is a dispute about what next happened . . . .
>
> ... [I]t is reasonable to infer that, when defendant asked Sgt. Setliff what would happen if he did not sign the "consent," Sgt. Setliff told him something to the effect that a search warrant would be sought; that all adults in the house (including Tina Jones) would be arrested; and that, since

there would be no adults to take care of the child, the child would be taken to the Department of Human Services for care. This would be an appropriate response, since, at the time of the arrest, Sgt. Setliff would have no way of knowing to whom the "crack" cocaine belonged. And, since all adults would be arrested, there would have to be arrangements made to take care of the small child. Thus, this would not be a threat (although defendant James Ivy and Tina Jones would perceive this as placing them on the horns of a dilemma).

Therefore ... the preponderance of the evidence indicates that the "consent to search" signed by defendant James Ivy was freely and voluntarily given and was not the result of coercion, duress, or submission to a claim of authority. Defendant was presented with a difficult choice (whether to sign and allow Tina Jones to stay with their child at 6706 Silhouette, or whether to refuse to sign, causing Ms. Jones to be arrested and the child to be taken for care and safekeeping by the Department of Human Services). However ... defendant freely and voluntarily made this choice, without any coercion, duress, or submission to a claim of authority by law enforcement officers.

On appeal, Ivy challenges the district court's ruling on two bases: first, that the district court erred in finding that Ivy consented to the officers' entry into his house; and, second, that the district court erred in finding that Ivy's consent to the police search of his house was given voluntarily.

## IV.  STANDARD OF REVIEW

In reviewing a district court's suppression determinations, this Court reviews findings of fact for clear error, and legal conclusions *de novo*. *See United States v. Murphy,* 107 F.3d 1199, 1204 (6th Cir.1997). Both issues presented by this case—whether consent to enter a house was actually given and whether consent to a search was in fact voluntary—are issues of fact, which will be overruled only if the district court's findings were clearly erroneous. *See United States v. Rose,* 889 F.2d 1490, 1494 (6th Cir.1989).

## V.  ANALYSIS

### A.  Consent to Enter the House

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses papers and effects, against unreasonable searches and seizures, shall not be violated." This principle generally prohibits the warrantless entry of law enforcement personnel into a person's home. *See Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). The prohibition does not apply, however, to situations in which voluntary consent has been obtained. *Id.* It is the government's burden to prove that the consent was freely and voluntarily given. *See Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

In the case *sub judice,* Ivy claims that he did not consent to the police entry into his home, and that this fact, in conjunction with the fact that the police did not have a search warrant, renders the search invalid. Ivy relies on his and Jones' testimony at the suppression hearing to support this claim, and argues that the district court's credibility finding was flawed. Ivy asserts that it is reasonable to suppose that he and his girlfriend were saving money in the night stand, and that his explanation to this effect at the suppression hearing did not taint his credibility in general. Ivy's arguments, however, miss the essential issue.

The district court made a finding of fact based upon the credibility of the witnesses it observed at the suppression hearing. Officers Harvey and Setliff testified that Ivy said "okay" when they asked if they could enter this house, and that they did not touch him. The district court believed their testimony over that of Ivy and Jones. The district court's credibility finding carries considerable weight. This Court has noted "[f]indings of fact anchored in credibility assessment are generally not subject to reversal upon appellate review." *United States v. Taylor,* 956 F.2d 572, 576 (6th Cir.), *cert. denied,* 506 U.S. 952, 113 S.Ct. 404, 121 L.Ed.2d 330 (1992). Indeed, "when there are two permissible views of the evidence, the fact finder's choice between them cannot be

clearly erroneous." *Id.* (quoting *United States v. Rose,* 889 F.2d at 1490, 1494 (6th Cir.1989)).

■ In this case, the district court chose between two competing accounts of what happened when the police arrived at 6706 Silhouette. The court adopted the version recounted by Officers Harvey and Setliff, and based its determination upon the credibility of different witnesses. In light of the significant fact-finding advantage the district court possessed in its opportunity to observe the demeanor of witnesses and to make critical judgments about their credibility, there is no basis for this Court to find that the district court committed clear error by finding that Ivy consented to the officers' entry into his house. Therefore, the district court's determination that Ivy consented to the officers entry into his house is affirmed.

### B. Consent to Search the House

■ While the Fourth Amendment protects citizens against unreasonable searches and seizures, a search is not unreasonable if a person with a privacy interest in the item to be searched gives free and voluntary consent. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Kelly,* 913 F.2d 261, 265 (6th Cir.1990). The government bears the burden of proving, through "clear and positive testimony" that the consent to search was given voluntarily. *See Bustamonte,* 412 U.S. at 248, 93 S.Ct. 2041; *United States v. Salvo,* 133 F.3d 943, 953 (6th Cir.1998); *United States v. Riascos–Suarez,* 73 F.3d 616, 625 (6th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 136, 136 L.Ed.2d 84 (1996). Consent is voluntary when it is "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." *United States v. McCaleb,* 552 F.2d 717, 721 (6th Cir.1977). Voluntariness is determined by examining the totality of the circumstances. *See Bustamonte,* 412 U.S. at 227, 93 S.Ct. 2041; *McCaleb,* 552 F.2d at 720. Several factors should be examined in this determination. First, a court should examine the characteristics of the accused, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights. *See United States v. Jones,* 846 F.2d 358, 360 (6th Cir.1988). Second, a court should consider the details of the detention, including the length and nature of detention; the use of coercive or punishing conduct by the police, *see Bustamonte,* 412 U.S. at 226, 93 S.Ct. at 2059; and indications of "more subtle forms of coercion that might flaw [an individual's] judgment." *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

■ Despite the district court's finding that Ivy's consent was voluntarily given, Ivy argues that, under the totality of the circumstances, his consent was a product of police coercion, and was not conferred voluntarily. Given the overwhelming evidence of coercion and intimidation employed by the police in obtaining Ivy's signature on the consent form, we agree that the Government did not meet its burden of proving by clear and positive testimony that Ivy's consent was voluntarily given.

As a threshold consideration, the length of detention before consent is a significant factor in any voluntariness determination. *See Bustamonte,* 412 U.S. at 226, 93 S.Ct. 2041. Ivy testified at his suppression hearing that approximately one and a half hours passed between the officers' initial request for consent and Ivy's ultimate decision to sign the consent form. At oral argument, counsel for the United States conceded that this estimation was correct. Further, it is undisputed that the entire incident, from the police knocking at the front door until the end of Ivy's videotaped questioning, took from seven to eight hours.

■ The prolonged length of Ivy's detention is particularly significant in light of the nature of his detention. Among other things, the police officers used unlawful threats in order to secure Ivy's consent. The district court found that Sergeant Setliff made statements to the effect that if Ivy did not sign a consent form, everyone in the house, including Ivy's girlfriend, Jones, would go to jail, and that Ivy and Jones' child would be taken into government protective custody. The

Government argues that Setliff's statements were lawful references to the fact that the officers could obtain a search warrant. It is true that an "agent's statements to the effect that he would obtain a warrant if [the suspect] did not consent to the search does not taint [the suspect's] consent to a search." *Salvo*, 133 F.3d at 954. Setliff's remarks, however, went far beyond a mere reference to the fact that he could obtain a warrant. Rather, he explicitly stated that if Ivy did not sign the form, he would arrest Ivy's girlfriend and take away their small child.

▇▇ The Government argues that Setliff's statements induced a mere subjective belief in Ivy that the police were coercing him to consent, and relies on the case of *United States v. Crowder*, 62 F.3d 782 (6th Cir.1995), which establishes that a subjective belief of coercion is not enough to vitiate voluntariness. The Government's reliance is misplaced. In *Crowder*, the defendant, who was under investigation for firing a gun over his neighbor's head, was taken into custody by police officers. Based on the defendant's statement that the gun was in the home of his girlfriend's mother, the police conducted a search of that home, and, after they found nothing, placed the defendant's girlfriend in a squad car without arresting her. The defendant then revealed the gun's actual location and consented to a search of that area. Later, the defendant asserted that his consent was invalid, as he volunteered the location of the gun only because "he thought the officers were arresting his girlfriend." *Id.* at 787. The Sixth Circuit rejected this argument, holding that "the defendant must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police." *Id.* Specifically, the *Crowder* court noted that the police did *not* threaten to arrest the defendant's girlfriend, and indicated that such action *would* constitute an objectively improper police action. Contrary to the Government's claim, *Crowder* establishes that a police officer's statement that he will arrest an innocent relative or intimate friend of a suspect if the suspect does not submit to a search is an unacceptable means of obtaining consent.

In this case, Sergeant Setliff was uncertain as to Jones' level of involvement, if any, in the drugs found on the premises when he stated he would arrest her. Under the circumstances, it appears the statements made by Setliff were not merely informative, but were specifically calculated to induce fear and apply pressure. The intimidating nature of Setliff's statement is particularly striking when one considers that Setliff not only threatened to arrest Jones, but also to take Ivy and Jones' child from their custody. Even if Setliff was correct in that both parents were about to be arrested and taken to jail, there were supervision alternatives to state custody, such as having the child stay with a friend or relative. That Setliff stated, unequivocally, that the child would go into government custody if Ivy and Jones did not consent to a search indicates that Setliff was not merely trying to provide Ivy with data upon which to base his decision to consent, but rather was attempting to overcome Ivy's resolution *not* to consent. Setliff's threat to arrest Jones and, especially, to take her child thus constituted an objectively improper police action per *Crowder*, significantly intensifying the coercive tenor of the request for consent.

Even more disturbing than Sergeant Setliff's foreboding statements are the actions the police took with regard to Jones and her child while awaiting either consent or a warrant to search Ivy's house. The police handcuffed Jones, by her legs, to the kitchen table. At points during the hour and a half while police attempted to induce either Jones or Ivy to sign a consent, the police took Jones' child from her. Jones was finally allowed to keep her child after Ivy signed the consent form. Courts have found that antagonistic actions by the police against a suspect's family taint the voluntariness of any subsequent consent. *See, e.g., United States v. Hurston*, 12 F.Supp.2d 630, 637 (E.D.Mich. 1998) (suspect's consent to search home was not given voluntarily, in light of "hectic" police entry, in which police "rounded up" suspect's children and fiancee); *United States v. Eggers*, 21 F.Supp.2d 261, 270–71 (S.D.N.Y. 1998) (police statement that suspect's children would be locked out of house until search was executed constituted duress and

coercion, annulling resultant consent). This Court now finds that such hostile police action against a suspect's family is a factor which significantly undermines the voluntariness of any subsequent consent given by the suspect.

After an hour and a half of this situation—of police threats to arrest Jones and take the child, of Jones being shackled to a table, of the child being taken from his mother's arms, of repeated police solicitations for consent— Ivy finally acquiesced and signed the consent to search form. Perhaps this was a form of coerced chivalry on Ivy's behalf. Perhaps his will was overcome by the time, the threats, the police handling his child, and the sight of his girlfriend chained to a table. One thing is certain: Ivy's consent was not voluntarily imparted; his will was indeed overcome. Given the totality of the circumstances, it is plain that the government did not meet its burden of proving by clear and positive testimony that Ivy gave his consent freely and voluntarily, untainted by any duress or coercion. This Court is "left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). We therefore find that the district court committed clear error when it held that Ivy's consent was voluntarily given and allowed into evidence the fruits of this unlawful search.

"Although there is always a temptation in cases of this nature ... to let the end justify the means," *United States v. Mesa,* 62 F.3d 159, 163 (6th Cir.1995), we must suppress the evidence collected from this unlawful search for several critical reasons. First, this Court must remain vigilant in its role as a guardian of the Constitution and its protections. We are bound to defend the liberties of even the most despised members of society, for it is in their cases that our freedoms are most at risk. Justice Jackson summed it up well:

Fourth Amendment freedoms ... are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government ... Only occasional and more flagrant abuses come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence and the defendant is at least sufficiently compromised to be indicted. If the officers raid a home, an office, or stop and search an automobile but find nothing incriminating, this invasion of the personal liberty of the innocent too often finds no practical redress. There may be, and I am convinced that there are, many unlawful searches of homes and automobiles of innocent people which turn up nothing incriminating, in which no arrest is made, about which courts do nothing, and about which we never hear. Courts can protect the innocent against such invasions only indirectly and through the medium of excluding evidence obtained against those who frequently are guilty.

*Brinegar v. United States,* 338 U.S. 160, 180–81, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (Jackson, J., dissenting). The guarantees of the Fourth Amendment do not expire merely because an individual is suspected of a crime; indeed, it is in such a situation that the protections against illegal police search and seizure become most meaningful. The occasional benefits that compliance with the Fourth Amendment confers upon the guilty must be recognized as a necessary consequence of guaranteeing constitutional protections for all members of our community.

Second, the exclusion of the evidence obtained in the present unlawful search will serve to deter future violations of the Fourth Amendment. Thus, we will "compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

For the foregoing reasons, the District Court's decision not to suppress the evidence obtained in this unlawful search is **REVERSED.**

## VI. CONCLUSION

The District Court's conclusion that Ivy consented to the officers' entrance into his house is **AFFIRMED**; while the District Court's conclusion that Ivy's consent for the police to search his house was voluntarily imparted is **REVERSED**. This case is **RE-MANDED** to the district court for proceedings consistent with this ruling.

Affirmed in part, reversed in part, and remanded.