# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 8, 2001

## STATE OF TENNESSEE v. MARCIA C. ROBINSON and SAMMY CLAUDE WILSON

### Appeal from the Circuit Court for Madison County
### No. 99-712     Roy B. Morgan, Jr., Judge

---

### No. W2000-02085-CCA-R3-CD  - Filed June 26, 2001

---

After a jury trial, Defendants were convicted of one count of attempt to manufacture methamphetamine and two counts of possession of methamphetamine. The trial court sentenced each Defendant to three (3) years in the Department of Correction for attempt to manufacture methamphetamine and eleven (11) months and twenty-nine (29) days for possession of methamphetamine. In this appeal as of right, Defendants assert that the trial court erred as to whether Defendant, Sammy Wilson, gave Investigator Markin consent to search his truck. From our review of the transcript of the motion to suppress, the trial record, briefs of the parties and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

L. TERRY LAFFERTY, SR. J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. DAVID H. WELLES, J., not participating.

J. Colin Morris, Jackson, Tennessee, for the appellants, Marcia C. Robinson and Sammy Claude Wilson.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; and Jody S. Pickens, Assistant District Attorney, for the appellee, State of Tennessee.

## OPINION

### MOTION TO SUPPRESS

On June 15, 1999, at 2:15 a.m., Sammy Markin, a Madison County Sheriff Deputy, was working in a private security capacity at Wal-Mart in Jackson, Tennessee. Deputy Markin, a 10-year law enforcement officer, had been assigned to the Metro Narcotics Bureau for two years. On the morning in question, Deputy Markin observed Defendants checking out certain items in the store. Deputy Markin noted the purchased items could be utilized to manufacture methamphetamine. This

observation was based on his experience as a narcotics officer. Deputy Markin followed Defendants outside to the parking lot approximately 10 feet from the pickup truck. Deputy Markin identified himself to the Defendants and they talked about the purchases made in Wal-Mart. As they talked, Deputy Markin looked inside the bed of the pickup truck and saw an "in-line" which takes the heat from water, quite a bit of glassware, and various plastic bottles with different liquids inside. At this time, Deputy Markin called for some backup. Subsequently, Sergeant Wilson with the Madison County Sheriff's Department arrived. Deputy Markin stated he asked Defendant, Sammy Wilson, the owner of the pickup, for consent to search the inside of the vehicle. Further questioning went as follows:

A. First, he was hesitant. He never gave me a negative response, but I would ask him, and it was a lot of hem-hawing, "I guess so," and a lot of mumbling that I couldn't understanding [sic].

Q. When you say hem-hawing, what --

A. Like he would answer it and then speak under his breath. He would say, "Yeah, I guess so," and then mumble under his breath, which not loud enough for me to hear, but I knew that he was speaking something, and I asked him, "Was that a yes or no," you know, after I explained to him, you know, he does not have to let me search the vehicle, and there was just probably maybe two or three questions there that he would answer and them [sic] mumble where I could not understand what he was saying.

Q. Did you feel comfortable with the way he answered your questions as far as him giving you consent to search?

A. No, sir. It was never a negative answer, but it was never a flat out, "Yes, you can."

Q. After he -- At this point was Sergeant Wilson on the scene?

A. Yes, sir. I waited 'til Sergeant Wilson showed up before I asked him.

Q. And once you did receive --You received an answer, although it wasn't negative, I think you described it as being, "I guess so."

A. Yes, sir.

Q. What did you do at that point since you did receive a strongly firm answer?

A. Well, I asked him -- The best answer I got was, "Yeah," and then I says, "Yes, I can search the vehicle," and he then mumbled again. I took that as a yes, I could search the vehicle. I went to Sergeant Wilson, and he was there as well, you know, listening to this, and I said, "Well, I guess I can get a search warrant," I said, "because he's

really not giving me a positive yes." And we were five to ten feet away, and Mr. Wilson said, "Yes, search the truck."

Deputy Markin searched the truck and found quite a few items consistent with the manufacturing of methamphetamine.

During cross-examination, Deputy Markin testified that he explained to Defendant twice about the consent to search. Deputy Markin described his encounter with Defendant as lasting about three to five minutes. In the truck, Deputy Markin found over 1100 loose pills of Actifed tablets in a butter dish, which are a prime ingredient for making methamphetamine and .8 grams of methamphetamine. The purchases at Wal-Mart consisted of alcohol, vinegar, Reynolds wrap, Duracell batteries, a wooden spoon and a body massager. A body massager could be used to crush pills. In plain view in the truck, Deputy Markin saw other items for manufacturing methamphetamine.

Brian Wilson, a sergeant with the Madison County Sheriff's Department, testified he received a backup call on June 15, 1999, at 2:15 a.m. to Wal-Mart. Upon arriving, Deputy Markin advised him of the situation and his suspicions of the components to manufacture methamphetamine. Sergeant Wilson was present when Deputy Markin asked Defendant for consent to search the vehicle.

A.      Mr. Wilson was initially evasive. I described it as hem-hawed back and forth because he was saying -- in denial of the accusation of having components to manufacture methamphetamine, but he did give verbal consent to search the vehicle. He eventually said that we could go ahead and look in the vehicle.

Q.      Were you present when Investigator Markin explained to him whether he had a right to object to the search or -- Were you present when he explained to him he didn't have to consent to the search?

A.      Yes, sir.

During cross-examination, Sergeant Wilson agreed Defendant was evasive in his answers about the consent, but there were no threats of an arrest. There was mention of a search warrant after the consent.

Defendants did not offer any proof as to the merits of the motion to suppress.

The trial court found Defendant gave consent by the response, "Yes, search the truck." Also, the trial court ruled, that notwithstanding the consent, the officer, based upon his training and circumstances, had a basis to investigate. The purchases in the store and what the officer observed in plain view in the back of the truck gave the officer probable cause to believe that the vehicle contained contraband and that exigent circumstances exist.

-3-

LEGAL ANALYSIS

Defendants argue that Defendant Wilson, did not give a voluntary consent to search his vehicle. The State counters that the trial court properly denied Defendant's motion to suppress in that voluntary consent was given for a search of the truck and that a consent to search was not needed because Investigator Markin had probable cause to search the vehicle.

We review the trial court's findings with this understanding. Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial court as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing, as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. *State v. Simpson,* 968 S.W.2d 776, 779 (Tenn. 1998); *State v. Odom,* 928 S.W.2d 18, 23 (Tenn. 1996).

The Fourth Amendment to the United States Constitution provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause. . . ." Similarly, Article 1, Section 7 of the Tennessee Constitution. Unless a search or seizure falls within a specifically established and well-delineated exception, a search conducted without a warrant is *per se* unreasonable. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). "One of the specifically established exceptions to both a warrant and probable cause is a search that is conducted pursuant to a voluntarily given consent. *Schneckloth v. Bustamonte,* 412 U.S. at 219, 93 S.Ct. at 2043-44; *See State v. Ashworth,* 3 S.W.3d 25, 28 (Tenn. Crim. App. 1999); *State v. Bartram,* 925 S.W.2d 227, 230 (Tenn. 1996). The burden of proof rests upon the State to show, by a preponderance of the evidence, that the consent to a warrantless search was given freely and voluntarily. *Schneckloth v. Bustamonte,* 412 U.S. at 248-49, 93 S.Ct. at 2059; *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); *State v. Ashworth,* 3 S.W.3d at 29. The question of whether an accused voluntarily consented to the search is a question of fact which focuses upon the totality of the circumstances. *See Schneckloth v. Bustamonte,* 412 U.S. at 248-49, 93 S.Ct. at 2059. "In order to pass constitutional muster, consent to search must be unequivocal, specific, intelligently given, and uncontaminated by duress or coercion. *See State v. Ashworth,* 3 S.W.3d at 29; *State v. Brown,* 836 S.W.2d 530, 547 (Tenn. 1992).

In determining the "totality of the circumstances" surrounding a consent to search, certain factors may apply. A defendant's age, his or her intelligence, education, does an accused understand the right to refuse to consent, the details of the detention, the possible use of coercion or punishing conduct by the police, and the length of detention. *United States v. Ivy,* 165 F.3d 397 (6th Cir. 1998). In applying these factors to the facts in this cause, we have the benefit of the trial testimony of both Defendants. *See State v. Henning,* 975 S.W.2d 290, 299 (Tenn. 1998) (holding that in evaluating the correctness of a trial court's ruling on a pre-trial motion to suppress, appellate courts may consider the proof adduced at both the suppression hearing and at trial.).

In their direct testimony, both Defendants denied any involvement in manufacturing methamphetamine or intent to do so, and that they were not involved in selling methamphetamine. However, the State's cross-examination of Defendant's knowledge of methamphetamine was quite revealing.

Defendants came to Jackson, Tennessee, looking for a motel, "and enjoy a little time on our own." Defendants lived near Huntingdon, Tennessee, 45 miles away, which city happened to have a Wal-Mart. However, Defendants were at Wal-Mart at 2:15 a.m., purchasing items that could be used for household purposes, as well as for manufacturing methamphetamine. Defendant Wilson, testified that as to the 1145 pills in the truck, he had "picked up a few here and there. . ." "Somebody brought some that got carried away in the number just as --." As to the .5 grams of methamphetamine found under the seat of his truck, Defendant stated as to his ownership, "Not really. . ." "I think it was left in there by a friend of mine." At first, Defendant Wilson, refused to disclose the friend's name, but after the Court's admonition and much prodding by the State, Defendant stated the methamphetamine belonged to Tommy Boshers. When asked if he had lied about not knowing the person who left the methamphetamine in his truck, Defendant responded, "I suppose you'd say that." It is abundantly clear Defendant was evasive in his testimony about the circumstances surrounding his arrest and knowledge of methamphetamine.

As to Defendant Robinson, when asked if she were guilty of these charges, she testified, "No. I can't even cook in the kitchen." When asked why she bought the pills in Wal-Mart, she stated:

> "We had just moved back from South Fulton, and prior to moving to South Fulton, we worked with the 24th Judicial Drug Task Force in Bruceton. And this is going to get me killed. And when we moved back, we got involved with a guy that got in trouble, and he sent us -- the Drug Task Force to our house, which they didn't find anything, didn't arrest us, and we were working on something for them that night, and if Officer Markin had of waited around, he could have got the guy that was the . . . ."

Defendant Robinson, stated she started working for the Drug Task Force as a volunteer because her daughter had gotten involved in drug usage. Also, she acknowledged that she knew how methamphetamine was manufactured, by the process of "cooking." As to the 1145 pills in the truck, she stated that Tommy liked to do 1500, and so she bought another 100 pills, although she had stated she had bought them as cold pills. Robinson denied being involved in building a meth lab, but acknowledged that "there's about eight or ten more items that goes with it to make it." Robinson seemed to indicate in her testimony that the items purchased would be used to work with the Drug Task Force in Carroll County, but then she testified the items were bought for home use.

We conclude, as did the trial court, that Defendant Wilson, gave a voluntary consent for the search of the interior of his truck. Deputy Markin's description of Defendant's evasiveness at Wal-Mart is corroborated by Defendant's testimony at trial. In each situation, Defendant would not give a definitive answer to questioning, until prodded to do so. We find that Deputy Markin's remark to

Sergeant Wilson about securing a search warrant was not a baseless threat or coercive in nature to have Defendant give a consent to search affirmative response. Certainly, Defendant was not under arrest or restricted to the confines of a police car. *See Bentley v. State,* 552 S.W.2d 778, 780 (Tenn. Crim. App. 1977); *State v. Denami,* 594 S.W.2d 747, 750 (Tenn. Crim. App. 1979). Considering the factors to determine the totality of the circumstances surrounding the voluntariness of a consent to search, we find no merit to Defendant's issue.

Having found that Defendant Wilson gave a valid and voluntary consent to search his vehicle, we elect not to address the State's argument as to the existence of probable cause.

The trial court's judgment is affirmed.

_____
L. TERRY LAFFERTY, SENIOR JUDGE