**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joseph JACKSON, Defendant–
Appellant.**

No. 02–5649.

United States Court of Appeals,
Sixth Circuit.

July 22, 2003.

Before KEITH, SUHRHEINRICH and
CLAY, Circuit Judges.

PER CURIAM.

Defendant Joseph Jackson appeals from
the final judgment and order denying his
motion to suppress. We AFFIRM.

I.

The following facts are derived from the
evidentiary hearing on Jackson's motion to
suppress. On January 9, 2001, members
of the Metro Gang Unit of the Memphis
Police Department arrested Jackson as a
suspect in an armed robbery investigation
at the home of his girlfriend, Lisa Mat-
thews, at 980 Creston, in Memphis, Ten-
nessee. The officers first went to the
home of Jackson's mother. Jackson was
not there, but his mother received a phone
call from Jackson. With that telephone
number, the officers were able to deter-
mine that the telephone call came from 980
Creston.

Based on this information, seven or
eight officers proceeded to the Creston
address. Four officers positioned them-
selves at the corners of the house, while
Officers Gipson, Wilkerson, Wilson, and
Marino went to the door. The front en-
trance of 980 Creston had a wooden inner
door and a metal outer door, which was

locked. The officers approached the door, guns drawn. They heard a dog barking inside. One of the officers saw someone looking out of the window. The officers knocked on the door, but no one answered for approximately three to five minutes. Finally, Ms. Lisa Matthews opened the inside wooden door. She was holding her dog by its collar, and her three children were crying. When the officers saw Matthews, they lowered their weapons.

The officers did not have an arrest warrant or a search warrant.

The parties dispute what happened next. Officers Wilkerson, Wilson, and Gipson testified that they told Matthews that they were looking for Jackson and that she replied that he was not there. The officers further stated that they asked to come in and that Matthews assented. The officers claimed that when asked if Jackson was hiding in the house, Matthews looked up at the ceiling twice.

The officers located the stairs to attic, and ordered Jackson to come down, which he did. According to the officers, they asked Jackson if there were any weapons in the residence and he told them that there was a pistol underneath the bed. Officer Jackson testified that they asked Jackson about the presence of any firearms because the officers had not done a protective sweep of the residence, and they did not want "someone else in [the] house to pop up we did not know was there armed with a weapon." Jackson was then handcuffed and taken outside.

The officers allege that at this point they asked Matthews if she would give them consent to search the house for stolen property. They claimed that Matthews consented to the search and signed a con-

sent form. Officer Wilkerson claimed that he told Matthews that "she did not have to let us search or sign the consent to search." The consent form was introduced during the suppression hearing as Exhibit 1.[1] It is signed by Matthews and witnessed by Officers Wilson and Wilkerson.

Officers Wilkerson, Gipson, and Wilson each testified that they did not yell or curse at Matthews, threaten her, or arrest her prior to her letting officers into the house. Each stated that Matthews gave them oral and written consent to search. Finally, the officers claimed that they found two more guns in the house, discovered after Matthews signed the consent form.

Matthews testified that she heard the knock on her door, looked out the living room window, and saw that the police had surrounded her house. Matthews claimed that she went to the den, and heard the officers ordering her to open up. She stated that she opened the inner wooden door, and noticed that the bottom glass of the outer storm door was out. Matthews testified that the officers had their guns drawn, and that they again ordered her to open up. Matthews denied that any officer asked for permission to enter. She admitted that she got the key to open the storm door, but stated that she felt that she did not have a choice, because of the officers' tone.

Matthews stated that the officers asked for Jackson, but that, when she asked them why they wanted to know, one of the officers said that he did not have to explain what was going on. Matthews claimed that she did not tell the officers anything about Jackson. She admitted that she

---

1. The consent form provides as follows:

CONSENT TO SEARCH

I understand that the Officers of the Shelby County Sheriff's Office are requesting my consent to search *980 Creston Mphs TN 38127* [.]

I further understand that my consent is voluntarily given, with the right to refuse, and without any threats, coercion or promises of immunity by officers(s) of the *Shelby County Sheriff's Office.*

heard a noise in the attic and looked up, but denied pointing or nodding at the ceiling. Matthews contended that she did not sign the consent form until after the officers discovered the guns. She further claimed that she was handcuffed, and that two black officers eventually took them off. Matthews testified that she signed the consent to search form because she "felt like I didn't have any choice, they had already searched the house, and I never have been put in a position like that before, so I really didn't know my rights."

On cross-examination, Matthews admitted that when she came to the door the officers put their guns down and that when they came into her house they were not threatening her with guns. She also acknowledged that she had the dog by the collar when she came to the door.

The magistrate judge issued a report in which he found that Matthews had given the officers consent to search, and recommended that Jackson's motion to suppress be denied. The magistrate judge basically concluded that the officers were more credible than Matthews. Jackson filed objections. After a de novo review of the record, the district adopted the magistrate judge's report and denied Jackson's motion. On appeal, Jackson challenges the district court's findings that Matthews actually consented to the officers' entry and that her consent to search was voluntary.

## II.

In determining whether the district court erred in denying Jackson's motion to suppress, we review its findings of fact for clear error and legal conclusions de novo. *United States v. Lawrence,* 308 F.3d 623, 626–27 (6th Cir.2002); *United States v. Ivy,* 165 F.3d 397, 401 (6th Cir.1998). As Jackson acknowledges, consent is an exception to the constitutional prohibition against both warrantless entry of police into a person's home, *Ivy,* 165 F.3d at 402;

*United States v. Kelly,* 913 F.2d 261, 265 (6th Cir.1990), and an unconsensual search of that home. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Ivy,* 165 F.3d at 402. The issues presented here, whether consent to enter the house was actually given and whether consent to a search was truly voluntary, are fact questions which we will overturn only if the district court's fact findings were clearly erroneous. *Ivy,* 165 F.3d at 401.

■ Jackson challenges the district court's factual determination that Matthews consented to the officers' entry. Regarding consent to enter Matthews' residence, the district court (by adoption of the magistrate judge's recommendation) found as a matter of fact that

the testimony of the three officers is more credible than the testimony of Ms. Matthews. All of the testifying officers denied shouting at Ms. Matthews. They all testified that, because of the furious barking of the dog and the three crying children, they had to speak more loudly than they would have, under other circumstances, but all denied using a "threatening" tone of voice. These officers were probably somewhat abrupt, since they were looking for an armed robbery suspect, there was a great deal of distracting noice [sic], they did not know who was in the house, and they did not know whether there might be others in the house who might be armed. However, ... under all of the circumstances, there was not any overpowering of the will of Ms. Matthews by the tone of the voices of the officers.

The district court made a finding of fact based on its credibility assessment of the witnesses at the suppression hearing. That credibility determination carries considerable weight. As we recently held in *Lawrence:*

The district court chose to believe the government's witnesses over Lawrence's witnesses. Thus, the district court made a credibility determination, and "findings of fact anchored in credibility assessment are generally not subject to reversal upon appellate review." *Ivy*, 165 F.3d at 401. Additionally, "when there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Id.* at 401–02. *Lawrence*, 308 F.3d at 627. The same is true here. The district court chose between two views of the evidence-Matthews' version of events and the officers'-and accepted the officers' view. As such, its fact finding cannot be clearly erroneous and is therefore not a permissible basis for overturning the denial of the suppression motion.

■ Jackson also challenges the district court's finding that Matthews' consent to search her house was voluntary. "Consent is voluntary when it is 'unequivocal, specific and intelligently given, uncontaminated by any duress or coercion.'" *Ivy*, 165 F.3d at 402 (quoting *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir.1977)). Voluntariness is determined by examining the totality of the circumstances. *Id.* This includes taking into account the characteristics of the accused, as well as the details of the detention. *Id.* Regarding consent to search, the magistrate judge found that

Officer Wilson testified that, after defendant had been taken outside, he asked Ms. Matthews if there were any other weapons or any stolen property in the residence. According to him, Ms. Matthews answered in the negative. She was then asked whether she would consent to a search of the house (that is, whether she would allow officers to "take a look around"). Officer Wilson testified that she said she would consent.

A "consent form" was then produced, and Ms. Matthews signed it.

Ms. Matthews admitted signing the "Consent" form, but insisted that she signed *after* all the searching was over. While she admitted knowing what she signed, she again stated that she felt like she did not have a choice.

On the other hand, Officers Wilkerson and Wilson both testified that the atmosphere had calmed down by the time Ms. Matthews was asked to sign the "Consent" form. The dog had been put up, and had stopped barking. The children had stopped crying. Defendant had been taken outside the house. According to these officers, they spoke to Ms. Matthews in a normal conversational tone, and Ms. Matthews seemed calm. All denied exerting any pressure on Ms. Matthews to get her to sign the "Consent".

Further, Officers Wilkerson and Wilson both testified that Ms. Matthews signed the "Consent" form *before* any further search of the residence was conducted.

Again, the district court made a fact finding, based on the totality of the circumstances that Matthews voluntarily gave her consent to search the residence. This included findings that Matthews had completed the 12th grade, and that she worked as a security officer at the Memphis airport, and ably "field[ed] pointed questions" by the Government. She admitted that she read the consent form and that she understood it. As for coercion, the district court credited the officers' testimony that they did not use any. Further, Matthews herself corroborated the officers' testimony that they put their guns down once she came to the door. Lastly, as the court found, Matthews had an intimate relationship with Jackson, which gave her a reason to be less than fully

candid. In short, the credible proof in this case established that Matthews voluntarily gave consent to search the residence. The motion to suppress was properly denied on this basis as well.

### III.

The judgment of the district court is hereby AFFIRMED.