**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Leslie Allen SMITH, Defendant–Appellant.**

**No. 02–6260.**

United States Court of Appeals, Sixth Circuit.

Feb. 24, 2004.

Candace G. Hill, Asst. U.S. Attorney, Terry M. Cushing, Asst. U.S. Attorney, Larry E. Fentress, U.S. Attorney's Office, Louisville, KY, for Plaintiff–Appellee.

Robert E. Harrison, Bowling Green, KY, for Defendant–Appellant.

Before NORRIS, GILMAN, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge.

Acting on a tip, police officers went to the residence of the defendant, Leslie Allen Smith, to search for stolen guns. Smith's then-wife permitted the officers to enter the house, where they found Smith and 11 guns. After the district court denied Smith's motion to suppress the guns, which were seized from his house, a jury convicted Smith of possession of firearms by a convicted felon with three previous convictions for violent felony offenses, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). On appeal, Smith argues that the district court erred (1) by refusing to compel the Government to disclose the identity of the informant whose information led to the search of his house, and (2) by denying his motion to suppress the weapons seized from his house on the ground that the weapons were the fruit of an illegal search. Because the trial court did not commit plain error by failing to order the Government to disclose the identity of the informant for purposes of trial, and because Smith's then-wife consented to the search of his residence, we affirm the judgment of the district court.

## BACKGROUND

On August 28, 2001, Captain Robert Huber of the Franklin Police Department re-

ceived an anonymous tip on the answering machine for the Crime Stoppers hotline. The caller stated that a person by the name of Leslie Allen Smith was living at 410 Railroad Street, that Smith was wanted in Indiana, that Smith had killed an Indiana State Police Trooper about 20 years ago, that Smith was in possession of 13 stolen guns, and that the guns would be gone if the police "did not act quickly." The caller also claimed that Smith "vowed not to be taken alive if [the police] did decide to go to the house and get him."

Later that day, the caller left a second message on the answering machine relaying the same information. Soon thereafter, the caller telephoned the Franklin Police Department directly and requested to speak to Huber. At the caller's request, Huber agreed to meet the caller at the police department.

At the meeting, Huber immediately recognized the caller as someone he had known "for quite awhile." The caller reemphasized the information provided earlier, and he stated that Smith worked at Cracker Barrel and that "the guns would be transferred to Russellville, Kentucky and be put on the street" if the police did not act quickly. In addition, he described Smith's residence, and he claimed that Smith lived there with a woman and that there was a black Jeep in the driveway. He also inquired about any monetary reward for his information.

After the meeting, Huber drove by the 410 North Railroad Street location to confirm the caller's information. The house at the address matched the caller's description, and there was a black Jeep in the driveway. Huber "ran" the license plate number on the Jeep and learned that the vehicle was registered to a woman

named Rhonda Leet. Huber did not run a criminal records search on Smith or contact police officials in Indiana to determine whether Smith was wanted by the Indiana police.

Huber then met with members of the Franklin Police Department and the Simpson County Sheriff's Department to discuss the information. The officers decided to conduct a "knock and talk" rather than seeking a search warrant, reasoning that it would take at least an hour to obtain a warrant and that, based on the caller's information, which Huber believed was reliable, they needed to "act more quickly."

Huber, Jamie Powell, Chief of the Franklin Police Department, and Deputy Gene Starks, an officer with the Simpson County Sheriff's Department, approached the 410 North Railroad Street residence. Huber and Starks were in street clothes, but Powell was in uniform. Other officers took up positions around the house. Huber and Powell stepped up on the porch and knocked on the door. Rhonda Leet, Smith's wife at the time, answered the door. Huber advised Leet of the officers' identity, and he told her that the police were searching for a "John Leslie Smith."[1] Leet denied knowing Smith.

Huber then motioned for Starks to come to the door, and the officers began to question Leet about the presence of stolen guns at the house. Huber warned her that "if these guns are in this house and they do get distributed out among someone in the street ... it could be dangerous for other people." The officers then asked whether they could "come in" and look around. Leet responded affirmatively and

---

**1.** Huber inadvertently inquired about "John Leslie Smith" instead of "Leslie Allen Smith," the defendant's correct name.

opened the door for them.[2] As the officers entered the house, Starks again asked whether Smith was present, and Leet responded affirmatively by nodding her head toward the back of the house.

As he entered the living room, Sparks noticed that a door in the back of the house was slightly ajar, and he observed "movement behind the door which appeared to be someone looking through the crack in the door." Sparks instructed whoever was behind the door to come out, and Smith emerged from the room. As Smith exited the room, Starks saw "what appeared to be long guns leaning against a back wall." Starks went into the back room where he discovered 11 "long guns" leaning against the back wall. Huber obtained identification from Smith and ran a "criminal history" on Smith, which revealed an outstanding warrant for Smith's arrest from Indiana. After receiving this information, the officers placed Smith under arrest and seized the guns. Later, at the police station, Leet signed a consent form relating to the search.

On November 7, 2001, a grand jury returned a one-count indictment charging Smith with knowingly being in possession of firearms that were in and affecting commerce while being a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). Smith moved to suppress the long guns found at his residence on the grounds that the search of the residence and the seizure of the guns violated the Fourth Amendment. The district court denied the motion, reasoning that Leet had consented to the search of the residence and that the weapons were "in plain view" when Smith exited the back room.

A jury convicted Smith, and, on September 30, 2002, the district court entered a judgment of conviction. On October 9, 2002, Smith filed a timely notice of appeal.

## ANALYSIS

### 1. Disclosure of the Informant's Identity

■ There is, first, no merit to Smith's argument that the district court violated "the fundamental requirements of fairness" by failing to order the Government to disclose the identity of the caller whose information led to the search of Smith's house. Smith contends that the caller's identity was relevant and material to his defense–which was that someone else placed the weapons in his residence–as the caller either must have been the person who planted the weapons or must have known the identity of the person who planted the weapons.

Smith, however, failed to raise this argument in the district court. Smith did request the informant's identity in connection with his motion to suppress; however, he never requested the informant's identity for use at trial. At the hearing on Smith's motion to suppress, defense counsel asked Huber on cross-examination to identify the informant. The Government objected, arguing that the informant's identity should not be disclosed as the Government had established that Huber had a reasonable basis for believing the informant's information. The district court sustained the objection. Crucially,

---

**2.** According to Leet's testimony, "[An officer] said, can we come in. I think I said, yes, shook my head, opened the door and let them come in." According to Huber's testimony, "We asked her if she minded if we came in the house and looked and at that time she said, no, I don't mind if you come in and she opened the door and stepped back to allow us to enter the door." Huber further testified that Leet said "you can come on in and look around." According to Sparks' testimony, "At first she denied knowing Leslie Smith, I did hear her say that, but then she told us we could look at the house and she stepped back and opened the door, held the door for us."

Smith did not alert the district court that he needed the informant's identity in order to present his defense at trial–rather than to support his motion to suppress–and Smith never renewed his request for the informant's identity.[3]

Consequently, we review the district court's failure to compel disclosure of the informant's identity for plain error. *See United States v. Wynne*, 993 F.2d 760, 766 (10th Cir.1993) (reviewing defendant's claim that the Government should have revealed the identity of a confidential informant for plain error because defendant did not raise the claim in the district court). Under the plain error test, there must be (1) error, (2) that is plain, and (3) that affects the defendant's substantial rights. *See United States v. Stines*, 313 F.3d 912, 918 (6th Cir.2002).

The Supreme Court has recognized an "informer's privilege," which permits the government to withhold from disclosure the identity of persons who furnish information of criminal activities to law enforcement officials. *United States v. Sharp*, 778 F.2d 1182, 1185 n. 1 (6th Cir.1985). Self-evidently, the purpose of the privilege is to further effective law enforcement by encouraging citizens to communicate their knowledge of criminal activities to law enforcement officials. *Id.* at 1185. The privilege is limited, however, by "fundamental requirements of fairness." *Roviaro v. United States*, 353 U.S. 53, 60, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). "Where the disclosure of the informer's identity ... is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60–61, 77 S.Ct. 623.

There is no fixed rule as to when disclosure is required. As the Supreme Court has instructed,

We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id.* at 62, 77 S.Ct. 623. Notwithstanding this balancing principle, disclosure is usually required when the informer was an active participant in the events underlying the defendant's potential criminal liability. *Sharp*, 778 F.2d at 1186 n. 2. Conversely, disclosure is not usually required when the informer was not a participant but rather "a mere tipster or introducer." *Id.*

"An informant must be disclosed only upon a showing by the defendant that disclosure is essential to a fair trial." *United States v. Moore*, 954 F.2d 379, 381 (6th Cir.1992). "Mere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure." *Sharp*, 778 F.2d at 1187 (quoting *United States v. Gonzales*, 606 F.2d 70, 75 (5th Cir.1979)).

The district court did not commit plain error by failing to direct the Government to disclose the caller's identity. Essentially, Smith contends that the district court should have divined that the caller's identity was "relevant and material" to Smith's defense and injected itself into Smith's preparation of his case by *sua sponte* ordering the Government to disclose the caller's identity. Manifestly, it was not so obvious to the district court that the call-

---

**3.** On appeal, Smith does not challenge the district court's ruling that Smith was not entitled to the informant's identity in connection with his motion to suppress.

er's identity was vital to Smith's defense as to require us to say that the district court plainly erred by failing to order disclosure of the caller's identity.

In fact, even if Smith had presented his argument to the district court, it does not appear that the court would have abused its discretion in denying a motion to compel disclosure of the informant's identity. *See United States v. Jenkins,* 4 F.3d 1338, 1341 (6th Cir.1993) (holding that a district court's refusal to order disclosure of a confidential informant is reviewed for abuse of discretion). The defendant bears the burden of showing "how the disclosure would substantively assist his defense," and "a simple statement" that the informant's testimony "might assist in his defense" does not suffice to compel disclosure. *Moore,* 954 F.2d at 381. On appeal, Smith simply asserts that "the informant may have been a participant or witnessed the offense." That is, he offers only "[m]ere conjecture or supposition about the possible relevancy of informant's testimony." *Sharp,* 778 F.2d at 1187. Additionally, even in Smith's hypothesis, the informant is potentially "a mere tipster," whose identity would be presumptively shielded by the informer's privilege.

*2. Denial of Smith's Motion to Suppress*

The district court also did not err in denying Smith's motion to suppress the long guns seized from the back room of his residence. Smith contends that the court clearly erred by finding that Leet, who was then Smith's wife, consented to the search of the back room of the house. He maintains that, while Leet consented to the officers' entry into the living room, Leet did not consent to a search of the house–particularly to a search of the back room.

"A district court's denial of a motion to suppress evidence is reviewed under a hybrid standard." *United States v. Orlando,* 281 F.3d 586, 593 (6th Cir.2002). The district court's findings of fact are reviewed for clear error, but its conclusions of law are reviewed de novo. *Id.* In considering the evidence involved in a motion to suppress, the court views the evidence in the light most likely to support the district court's decision. *Id.* Generally, the question of whether an individual voluntarily consented to a search is a question of fact. *United States v. Guimond,* 116 F.3d 166, 169 (6th Cir.1997).

"Generally, a warrant based on information establishing probable cause is required to search a person or a place and to seize evidence found there." *United States v. McLevain,* 310 F.3d 434, 438 (6th Cir.2002). However, an officer may conduct a search without a warrant if he has valid consent from a person with a privacy interest in the place to be searched. *United States v. Elkins,* 300 F.3d 638, 647 (6th Cir.2002); *United States v. Palomino,* 100 F.3d 446, 450 (6th Cir.1996).

The Government bears the burden of proving, through clear and positive testimony, that consent was freely and voluntarily given. *United States v. Ivy,* 165 F.3d 397, 402 (6th Cir.1998); *Palomino,* 100 F.3d at 450. The voluntariness of consent is determined from the totality of the circumstances, and several factors should be examined in this determination, including (1) the age. intelligence, and education of the individual, (2) whether the individual understands his right to refuse consent and his constitutional rights, (3) the length and nature of the detention, and (4) the use of coercive or punishing conduct by the police. *Elkins,* 300 F.3d at 647; *Ivy,* 165 F.3d at 402. The scope of the consent determines the permissible scope of the search. *Elkins,* 300 F.3d at 648. Any evidence discovered during a search based on consent may be seized and admitted at trial. *United States v. Rich-*

*ardson,* 949 F.2d 851, 858 (6th Cir.1991) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 243, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).

The district court's finding in this case that Leet consented to the search of the entire residence was not clearly erroneous. The testimony of the officers, which the district court was entitled to credit, indicated that Leet consented to the officers' search of the house for Smith and the stolen guns. Huber testified that, after the officers inquired about Smith and stolen guns, Leet told the officers "you can come on in and look around." Similarly, Sparks testified that, after their initial conversation, Leet told the officers "we could look at the house and she stepped back and opened the door, held the door for us." Moreover, Leet's testimony corroborated portions of the officers' testimony. Although she asserted at the hearing on Smith's motion to suppress that she did not consent to a search of the residence, she conceded that she told the officers that they could "come in," that she opened the door for the officers, and that she did not object to the search at the time.

Moreover, the record does not suggest that Leet's consent was not free and voluntary. The officers did not use coercive tactics, and Leet was not detained when she gave her consent. Leet did not testify that she did not understand her right to refuse consent, and there is no indication that Leet, an adult, was below average in intelligence. In sum, the district court's finding of consent was not clearly erroneous.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.