level and specific enhancements that it imposed upon the defendants.").

For these reasons, we conclude that the district court erred in enhancing Orlando's base offense level by three points without making specific factual findings concerning the amount of laundered funds for which he was accountable. Orlando's sentence must therefore be vacated, and we must remand for resentencing.

### III.   CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the defendants' convictions and Daniels's sentence, but **VACATE** the sentence of Orlando and **REMAND** for resentencing.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0069P (6th Cir.)
File Name:  02a0069p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

        *v.*

LAWRENCE ORLANDO, SR.
(00-6312) and TERA M.
DANIELS (00-6409),
        *Defendants-Appellants.*

Nos. 00-6312/6409

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 98-00160—Todd J. Campbell, District Judge.

Argued:  February 1, 2002

Decided and Filed:  February 25, 2002

Before:  MARTIN, Chief Circuit Judge; GILMAN, Circuit
Judge; EDMUNDS, District Judge.

_____

[*]The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

**COUNSEL**

---

**ARGUED:** Jerry Scott, SCOTT & KEA, Murfreesboro, Tennessee, Charles R. Ray, RAY & FRENSLEY, Nashville, Tennessee, for Appellants. Jimmie Lynn Ramsaur, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Jerry Scott, SCOTT & KEA, Murfreesboro, Tennessee, Charles R. Ray, RAY & FRENSLEY, Nashville, Tennessee, for Appellants. Jimmie Lynn Ramsaur, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Lawrence Orlando, Sr. and Tera Daniels were convicted by a jury of conspiring to use the mail and interstate commerce facilities to aid in the operation of a prostitution business, in violation of 18 U.S.C. § 371, and conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h). In addition, Daniels was convicted of committing the substantive criminal acts that were the unlawful goals of the conspiracy, in violation of 18 U.S.C. §§ 2, 1952, 1956, and 1957. The district court sentenced Orlando to 63 months in prison followed by 2 years of supervised release, and it sentenced Daniels to 210 months in prison followed by 2 years of supervised release. Orlando and Daniels now appeal, challenging their convictions and sentences on various grounds. For the reasons set forth below, we **AFFIRM** the defendants' convictions and Daniels's sentence, but **VACATE** the sentence of Orlando and **REMAND** for resentencing.

Although the government contends that the district court made individualized determinations for each defendant, this argument overlooks the fact that the court neglected to identify the particular evidence presented at trial and at the sentencing hearing that led it to find Orlando accountable for $449,000. *See United States v. Corrado*, 227 F.3d 528, 540-41 (6th Cir. 2000) (remanding the case for resentencing because the district court "either summarily adopted the findings of the [PSR] or simply declared that the enhancement in question was supported by a preponderance of the evidence," thereby failing to comply with the requirement of Rule 32(c)(1) of the Federal Rules of Criminal Procedure that it make specific factual findings for each sentencing matter controverted); *United States v. Monus*, 128 F.3d 376, 396-97 (6th Cir. 1997) (holding that the district court failed to comply with Rule 32(c)(1) because its oral finding regarding the value of loss resulting from Monus's offense was stated in general terms and "did not explain how it calculated the amount of loss or respond to the defendant's specific factual objections to the methods of calculation included in the [PSR]"); *cf. United States v. Wilson*, 168 F.3d 916, 925 (6th Cir. 1999) (holding that the district court complied with the requirements of § 1B1.3(a)(1)(B) where it "made specific references to testimony in the record relating to the scope of [the defendant's] involvement in the drug trafficking conspiracy," noted that the relevant testimony was unrefuted, and stated that the testimony was internally consistent).

The government's focus on the evidence presented at trial and during the sentencing hearing does not alter the fact that the district court failed to refer to particular evidence or present anything more than general conclusions in its Rule 32(c) findings as to Orlando. Although the evidence may justify holding Orlando accountable for $449,000 of laundered money, the district court's failure to explain its factual determination requires us to remand the case for his resentencing. *Corrado*, 227 F.3d at 541 ("Without a record of the district court's findings, we are unable to conduct a meaningful review of its determinations as to the base offense

conspiracy, a district court must differentiate between the coconspirators and make individualized findings of fact for each defendant. *United States v. Meacham*, 27 F.3d 214, 217 (6th Cir. 1994) (remanding the case for resentencing because "the district court failed to make individualized findings regarding the scope of the conspiracy and the duration and nature of each defendant's participation in the scheme"); *United States v. Jenkins*, 4 F.3d 1338, 1347 (6th Cir. 1993) (explaining that § 1B1.3 "instructs that differentiation between co-conspirators is required" and remanding the case for resentencing so that the district court could "determine the scope of the criminal activity [the defendant] agreed to undertake").

The district court, in responding to Orlando's objections to his PSR, made the following finding with respect to the amount of laundered money for which Orlando should be held accountable:

> The Court finds, based on the evidence at trial and sentencing, that during Defendant's involvement in the conspiracy, approximately $449,000 was laundered and was reasonably foreseeable by Defendant. Pursuant to U.S.S.G. § 2S1.1(b)(2), the range of $350,000 to $600,000 applies and three (3) points are added to the Offense Level. Accordingly, the objection is DENIED.

No other explanation is found in the record. The court, for example, did not make a specific determination of when Orlando entered the conspiracy, nor did it indicate "the scope of the criminal activity [Orlando] agreed to jointly undertake." U.S. Sentencing Guidelines Manual § 1B1.3, cmt. n. 2. This failure to make specific findings to justify holding Orlando accountable for $449,000 of laundered money is even more apparent in comparison with the court's disposition of Daniels's objections to her PSR. The court included the factual determinations that it made at Daniels's sentencing hearing in the findings that it prepared in response to her objections pursuant to Rule 32(c)(1) of the Federal Rules of Criminal Procedure.

## I. BACKGROUND

### A. Factual background

This case concerns the defendants' involvement with "Dawn's Whirlpool and Massage" (Dawn's), a business that Daniels opened in October of 1989. The superseding indictment, issued ten years later, alleges that Daniels, Orlando, and several others used Dawn's as a front for prostitution. Customers paid for sexual acts and services with credit cards, personal checks, or cash, but the payments were made to Tera Enterprises, Inc., a corporation that Daniels had created, rather than to Dawn's.

More than two years prior to the commencement of an investigation into Daniels's illegal activities in November of 1995, Daniels was interviewed by several agents from the Internal Revenue Service's Criminal Investigation Division (CID), including James Bolton and Morris Elam. As a result of the information that she provided during these interviews, Daniels was subpoenaed to appear before a federal grand jury that was investigating the activities of Charles Hendricks. Hendricks was the target of a criminal investigation for money laundering of prostitution proceeds, tax fraud, and conspiracy.

Daniels's grand jury testimony, which occurred on August 11, 1993, was consistent with the information that she had given in her interviews with the CID agents. Specifically, Daniels admitted that she owned Dawn's, that acts of prostitution occurred there, that Dawn's accepted credit cards as payment for prostitution, and that she gave Hendricks the credit card slips to launder through a business that he owned. (Daniels ended her association with Hendricks in January of 1992, after which she began laundering funds through Tera Enterprises, Inc.) Troy Hester, the Assistant U.S. Attorney (AUSA) who was conducting the grand jury proceeding, informed Daniels that the federal government had no interest in prosecuting her for any of her previous illegal activities, but told her that he could not make any promises about what

might happen to her in the future if she continued to engage in these activities.

The government's investigation of Dawn's did not commence until over two years later, when CID Agent Ken Runkle conducted an interview with Dr. Richard Feldman on November 14, 1995. Dr. Feldman had hired private investigators to examine the activities that occurred at Dawn's after several of Dawn's employees brought charges against him before the state medical board. At this meeting, Dr. Feldman told Runkle that Daniels owned Dawn's, that she was operating the business as a front for prostitution, and that she was not reporting all of the illicit proceeds from the business to the IRS. Following his conversation with Dr. Feldman, Runkle began an investigation of Daniels's activities.

Runkle consulted a variety of sources—including business records, the Nashville Metropolitan Police Department, other CID agents, and the records of IRS interviews with Daniels—in the initial stages of his investigation. In addition, Runkle and CID Agent Bolton met with AUSA Hester to inform him of the preliminary stages of the investigation and to determine whether the U.S. Attorney's Office would be interested in pursuing charges against Daniels based upon Dr. Feldman's allegations. Hester expressed an interest in the case, and the criminal prosecution chief for the U.S. Attorney's Office agreed to open a file. Bolton provided all of his files concerning Daniels, including the grand jury transcript, to Runkle following their meeting with Hester.

As the investigation of Daniels's alleged money laundering and income tax violations continued, Runkle sought and obtained access to Daniels's tax information from the IRS's Civil Division. Runkle completed a "related statute request or determination," which he then submitted to the chief of the CID, so that he could gain access to the IRS computer bank and determine whether a civil audit was being performed on Daniels. Once he learned that a civil audit was open, Runkle

conclude that the district court's decision not to grant Daniels a downward departure is unreviewable because the court was fully aware that it possessed the authority to grant a downward departure and simply declined to do so.

## G. The district court erred in enhancing Orlando's offense level by three points based upon the amount of laundered funds for which he was accountable

Orlando argues that the district court erred in enhancing his offense level by three points pursuant to § 2S1.1(b)(2) of the United States Sentencing Guidelines. According to Orlando, the district court failed to make a proper factual determination regarding the extent of his involvement in the conspiracy and erroneously calculated the portion of the laundered funds that were reasonably foreseeable to him.

In interpreting § 1B1.3(a)(1)(B) of the United States Sentencing Guidelines, which discusses relevant conduct for the purpose of a defendant's sentencing accountability where "jointly undertaken criminal activity" occurred, this court has explained that "the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *United States v. Swiney*, 203 F.3d 397, 402 (6th Cir. 2000) (noting that "under the Sentencing Guidelines, a defendant is accountable for the conduct of other conspirators only if that conduct was (1) reasonably foreseeable to him and (2) in furtherance of the jointly undertaken criminal activity") (internal quotation marks omitted). The government must prove by a preponderance of the evidence that a defendant is accountable for specific conduct—the amount of laundered money attributable to Daniels and Orlando in the present case—for the purposes of the sentencing guidelines. *United States v. Bahhur*, 200 F.3d 917, 924 (6th Cir. 2000) (explaining that "the government bears the burden of proving a sentencing enhancement by a preponderance of the evidence").

In applying the sentencing guidelines to particular defendants who have been convicted for their role in a

## F.  The district court did not err in refusing to grant Daniels a downward departure

Daniels's final argument is that the circumstances surrounding her money laundering conviction were atypical of what occurs in traditional money laundering offenses because she did not attempt to conceal her profits or use the laundered money to further other criminal activities. She therefore argues that the district court should have granted her a downward departure pursuant to U.S. Sentencing Guideline § 5K2.0, which authorizes a downward departure in the discretion of the sentencing judge for circumstances not adequately taken into account by the sentencing guidelines.

As noted previously, however, a district court's decision declining to grant a downward departure is not appealable unless the court believed that it lacked the authority to grant a departure. *United States v. Henderson*, 209 F.3d 614, 617 (6th Cir. 2000). In the present case, the district court recognized that it had the authority to grant a downward departure, but declined to do so. The court specifically addressed the argument that Daniels raises on appeal, stating that "the money laundering wasn't incidental to the underlying offenses."

Moreover, an amendment to the Sentencing Guidelines, which became effective on November 1, 2001, does not benefit Daniels. The amendment is intended to "tie offense levels for money laundering more closely to the underlying conduct that was the source of the criminally derived funds . . . ." U.S. Sentencing Guidelines Manual Supplement to App. C, amend. 634. Because "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced," U.S. Sentencing Guidelines Manual § 1B1.11(a), this amendment does not apply to the present case. Furthermore, the district court's finding that the money laundering was not incidental to the underlying offenses indicates that the principles behind the amended version of § 2S1.1 would not have altered the court's decision declining to grant Daniels a downward departure. We therefore

contacted the agents conducting the audit to obtain Daniels's tax files and instructed them to cease the civil audit process.

On March 1, 1996, Runkle prepared an affidavit in support of a search warrant, which was issued that same day by a magistrate judge. The place to be searched was the residence of Joan Gould, Daniels's mother and the bookkeeper for Dawn's. A search was conducted on March 5, 1996.

Orlando's connection with Dawn's began when he met Daniels in 1995. They were involved in a tumultuous long-term romantic relationship, with about 20 separations between 1995 and 1999. From the beginning of his relationship with Daniels, Orlando knew that Dawn's was a front for prostitution, because Daniels referred to it as a "gentleman's club." On several occasions during their relationship, moreover, Orlando urged Daniels to get rid of Dawn's.

Orlando had no role in the business operations of Dawn's. In fact, if Orlando happened to interrupt a meeting concerning Dawn's, the managers would cease any discussions of business matters. Furthermore, Orlando's name did not appear on the applications for any of the business licenses that Daniels submitted to local authorities. Orlando did, however, comply with Daniels's request and sign a license for a business named "Above it All Whirlpool and Spa" in 1996 or 1997. That business lasted for about six months before it was dissolved.

Orlando's son, his son's wife, and his son's mother-in-law worked at Dawn's for brief periods in the spring of 1996. In May of 1996, moreover, Orlando visited Dawn's frequently while he was installing antique doors as a present to Daniels. During 1997 and 1998, Orlando retrieved sealed envelopes from Dawn's about two dozen times and took them to Daniels's house, using a truck that Daniels owned. Orlando also served as the cashier of Dawn's for 25 days between August and November of 1999. In this capacity, Orlando collected the daily receipts, but he did not discuss Dawn's operation with anyone and was not paid for his services.

## B.  Procedural background

A federal grand jury issued an indictment on November 5, 1998 against Daniels and four of her employees.  On November 10, 1999, a superseding indictment was issued that added Orlando and five more individuals.  All of the defendants except Daniels and Orlando pled guilty.

Prior to trial, Daniels filed motions to suppress the evidence obtained at Gould's residence and to dismiss the indictment.  Daniels's motions were based upon her contention that the search warrant and indictment were invalid because the government obtained them in violation of her Fifth Amendment rights.  According to Daniels, the government used the testimony that she gave in the 1993 grand jury proceeding—which she argued was immunized—to prepare the affidavit necessary to establish probable cause to conduct the search and to obtain the indictment.  She also argued that the evidence unveiled as a result of the search should be suppressed because CID Agent Runkle obtained the IRS Civil Division's files in violation of the IRS's internal procedures and federal law.

The district court denied Daniels's motions after conducting a multi-day evidentiary hearing pursuant to the procedures set forth in *Kastigar v. United States*, 406 U.S. 441 (1972).  Following the hearing, the court concluded that even if Daniels had been granted immunity in 1993, the government had established an independent basis for the allegations contained in the search warrant and the indictment. The district court also concluded that Runkle did not violate federal law by gaining access to Daniels's tax files from the IRS Civil Division, because he obtained the records as part of an investigation into allegations of criminal activity concerning tax administration. As a result, Runkle did not need an ex parte order from a federal district court judge or a magistrate judge in order to view Daniels's records.

The trial in the present case commenced on May 1, 2000, with the jury returning its verdict on May 17, 2000.  Daniels was found guilty on all 35 counts against her.  Orlando, in

sentenced to terms of imprisonment that were within the maximum penalties for the RICO offenses that they were found guilty of committing).

With regard to Daniels's argument that she should not have been held accountable for in excess of $2,000,000 of laundered money, the district court reached its finding after hearing testimony from Linda Joseph, the probation officer who prepared Daniels's PSR, Gould, and Daniels.  Joseph testified that she reached a figure of $2,500,327 in laundered money by adding all of the business tax license receipts from July of 1993 to November of 1998. Although this time frame did not correspond exactly with the superseding indictment, which applied from September of 1993 to November of 1999, and the figure had a $41,650 error due to the inclusion of a tax license receipt that predated the superseding indictment's temporal period, the corrected figure was still greater than the $2,000,000 necessary to justify a six-point offense level enhancement under the sentencing guidelines that were in effect on the date of Daniels's sentencing. In addition, Gould testified that the dollar values on the business licenses were too low, and that the actual total would require doubling the $2,500,327 figure.

The district court based its finding on this testimony and the evidence presented at trial dealing with the business licenses. Although Daniels challenged Gould's assessment of the business license figures and claimed that the totals were cumulative, the court did not find her testimony credible in light of the evidence presented at trial, including Daniels's testimony that she had been offered $650,000 and five cars for her business.  The district court therefore found that the value of the laundered funds exceeded $2,000,000, and it noted that it made its findings beyond a reasonable doubt. Based upon the record and the district court's detailed analysis, we conclude that the court did not err in holding Daniels accountable for in excess of $2,000,000 of laundered money.

motions for a new trial based upon the allegations of extraneous influences on the jury.

**E.  The district court did not err in holding Daniels responsible for in excess of $2,000,000 of laundered money**

Relying on *Apprendi v. United States*, 530 U.S. 466 (2000), Daniels argues that the district court erred in holding her responsible for an amount of laundered money that was not set forth in the indictment, presented to the jury, and proved beyond a reasonable doubt. Daniels also contends that the district court's determination that she was responsible for in excess of $2,000,000 of laundered money is clearly erroneous.

In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. The offenses for which Daniels was convicted each have maximum penalties of 20 years' imprisonment. 18 U.S.C. § 1952(a) (authorizing a sentence of imprisonment "for not more than 20 years" for a violation of § 1952(a)); 18 U.S.C. § 1956(a)(1) (authorizing a sentence of "imprisonment for not more than twenty years" for a money laundering conviction); 18 U.S.C. § 1956(h) (providing that a person who conspires to commit money laundering is "subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy").

Daniels was sentenced to a term of incarceration of 210 months (17.5 years), followed by 2 years of supervised release. Because Daniels's sentence does not exceed the statutory maximum for the offenses that she was found guilty of committing, *Apprendi* is not implicated, and the amount of laundered money for which Daniels was held responsible did not need to be set forth in the indictment, presented to the jury, and proven beyond a reasonable doubt. *United States v. Corrado*, 227 F.3d 528, 542 (6th Cir. 2000) (holding that *Apprendi* was not triggered because the defendants were

contrast, was found guilty on 2 counts of conspiracy charges, but was acquitted on all of the substantive counts.

On May 18, 2000, one of the jurors, Kimberly Wade, contacted Orlando and informed him of alleged irregularities that occurred during the jury deliberations, including the possibility that the verdict against Orlando was not unanimous and that some of the jurors read newspaper accounts of the trial while deliberating. Orlando promptly filed a motion for a post-verdict hearing to determine whether any errors tainted the jury's deliberations. Following a hearing on May 26, 2000, the district court issued an order directing Wade to appear for questioning on May 30, 2000.

Wade's testimony focused on nine alleged extraneous influences on the jury: (1) newspaper articles about the case, (2) discussion of a business called "The Chamber," which was located next to Dawn's and to which the district court had prohibited any references during the trial because sadomasochistic sexual acts occurred there, (3) police statements that Wade claimed were related to the jury by its foreperson, Joseph Martin, (4) a television news program titled "Sin City," (5) a jury administrator's comment that a jury verdict was preferable to a hung jury, (6) relationships of several of the jurors with Dr. Feldman, (7) visits to *The Tennessean* newspaper website, (8) Martin's statements regarding the defendants' strategy and mistrial requests made during jury-out hearings, and (9) Martin's comments about miscellaneous matters not admitted into evidence, including the names of clients who had visited Dawn's and the fact that Orlando had been placed on house arrest.

The defendants subsequently filed motions for a hearing to investigate the alleged jury irregularities pursuant to the procedure set forth in *Remmer v. United States*, 347 U.S. 227 (1954). Their motion was granted, with the district court conducting a hearing over five days in June and July of 2000. The court heard testimony from all of the jurors, from the three alternate jurors, and from Martin's wife, Margaret Martin.

At the conclusion of the hearing, the defendants filed motions for a new trial, claiming that the jurors were exposed to extraneous influences that invalidated their verdict. The district court denied their motions, concluding that "the *Remmer* hearings in this case have not revealed juror exposure to any extraneous information that prejudiced the Defendants." As the court explained, "[a]lthough Juror Wade made several allegations of juror exposure to extraneous prejudicial information, a review of all of the testimony adduced at the *Remmer* hearings indicates that the allegations either lack credibility; or that no prejudice to Defendants resulted from juror exposure to extraneous information."

The Presentence Investigative Reports (PSRs) that were prepared prior to the sentencing of Daniels and Orlando recommended enhancements to each defendant's base offense level to reflect the value of the funds that the defendants laundered. Specifically, the PSR for Daniels recommended that she be held accountable for at least $2,500,000 of laundered money, leading to a six-level enhancement under § 2S1.1(b)(2)(G) of the United States Sentencing Guidelines. This guideline applied if the value of the laundered funds exceeded $2,000,000.

Orlando's PSR recommended that he be held accountable for $449,655.62, leading to a three-level enhancement under § 2S1.1(b)(2)(D) of the United States Sentencing Guidelines. This guideline applied if the value of the laundered money was between $350,000 and $600,000.

Each defendant objected to numerous aspects of the PSRs, including the amount of funds for which the PSRs recommended that they be held accountable. The district court overruled all of their objections. With the exception of one of Daniels's objections, which was denied as moot because it did not affect Daniels's sentence, all of the denials were based on the court's factual findings.

The district court sentenced Orlando to 63 months in prison followed by 2 years of supervised release. Daniels was

Martin's comments, we conclude that the evaluation of Springer's testimony by the district court was not an abuse of discretion. Similarly, we find no abuse of discretion in the district court's evaluation of the other allegations of extraneous influences on the jury.

The defendants also request us to reconsider this court's prior decisions interpreting *Remmer* and *Smith v. Phillips*, 455 U.S. 209 (1982). They urge the adoption of the Eleventh Circuit's standard that only a "reasonable possibility" of juror bias be required in order to obtain a new trial. *Compare United State v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999) (noting that, at a *Remmer* hearing, "the defendant bears the burden of *proving actual juror bias*, and no presumption of prejudice arises merely from the fact that improper contact occurred") (emphasis added and citation omitted) *with United States v. Bollinger*, 837 F.2d 436, 439 (11th Cir. 1988) ("Juror exposure to extrinsic evidence mandates a new trial only if the evidence poses a *reasonable possibility of prejudice* to the defendant.") (emphasis added).

This court, however, "has consistently held that *Smith v. Phillips* reinterpreted *Remmer* to shift the burden of showing bias to the defendant rather than placing a heavy burden on the government to show that an unauthorized contact was harmless." *Zelinka*, 862 F.2d at 95. We therefore have no authority to consider the defendants' argument that this court places an insurmountable burden on defendants who allege that extraneous influences biased a jury, because "a prior published opinion of this court is binding unless either an intervening decision of the United States Supreme Court requires modification of the prior opinion or it is overruled by this court sitting en banc." *United States v. Roper*, 266 F.3d 526, 530 (6th Cir. 2001). Neither of these situations has occurred. As a result, *Zelinka* and its predecessors continue to govern allegations of juror bias due to extraneous influences in cases tried within this circuit.

For all of these reasons, we conclude that the district court did not abuse its discretion in denying the defendants'

We conclude that the district court did not abuse its discretion in denying the defendants' motion for a new trial based upon the alleged jury irregularities. The district court conducted a thorough *Remmer* hearing, during which all of the empaneled jurors, the three alternate jurors, and Martin's wife testified. Counsel for the defendants had the opportunity to question all of the witnesses during the hearing, without any limitations other than those set forth in the Federal Rules of Evidence. *See id.* at 96 (holding that the district court did not abuse its discretion in denying Zelinka's motion for a mistrial based upon alleged juror bias, noting that the *Remmer* hearing "was unhurried and thorough" and that "[d]efense counsel were permitted to question the jurors and did so at some length").

Although the defendants focus on the comments that Martin allegedly made about knowing police officers who were familiar with what actually occurred at Dawn's, the testimony of alternate juror Springer, upon which the defendants rely, does not support a finding of prejudicial extraneous influences. Springer testified that he remembered Martin making "an innuendo" or a "surmise" in a "five-second sentence" suggesting that he knew or had spoken with police officers who were aware of what occurred at Dawn's. During the same testimony, however, Springer said that he did not know whether Martin was talking about matters pertaining to the present case, and that Martin never stated as a fact that he knew what occurred at Dawn's.

The district court considered this testimony and concluded that it was "simply too vague to support Wade's allegation that Martin stated he *had* spoken to police officers and *had been told* that prostitution occurred at Dawn's." (Emphasis in original.) Instead, the court determined that "[a]t most, this testimony indicates that Martin said he knew police officers who likely would be able to confirm whether prostitution occurred at Dawn's. Stating that the police would likely have certain information, however, is not the same as obtaining such extraneous information and revealing it to the other jury members." In light of Springer's characterizations of

sentenced to 210 months in prison followed by 2 years of supervised release. This appeal followed.

## II.    ANALYSIS

### A.    Standards of review

Where a district court denies a defendant's motion to dismiss an indictment after conducting a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972), and determines that the government did not use immunized testimony to obtain the indictment, the district court's decision will not be set aside unless clearly erroneous. *United States v. Bartel*, 19 F.3d 1105, 1112 (6th Cir. 1994). Factual findings are clearly erroneous if, based upon the entire record, the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595 (6th Cir. 2001) (internal quotation marks and citation omitted).

A district court's denial of a motion to suppress evidence is reviewed under a hybrid standard. Its findings of fact are reviewed under the "clearly erroneous" standard, but its conclusions of law are reviewed de novo. *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000). In considering the evidence involved in a motion to suppress, the reviewing court must view the evidence "in the light most likely to support the district court's decision." *Id.* (internal quotation marks and citation omitted).

A district court's decisions regarding alleged juror misconduct are reviewed to determine whether the district court committed an abuse of discretion under all of the circumstances. *United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999).

As with a denial of a motion to suppress evidence, a district court's factual findings made at a sentencing hearing are reviewed under the clearly erroneous standard, but its legal conclusions regarding the application of the United States

Sentencing Guidelines are reviewed de novo. *United States v. Hamilton*, 263 F.3d 645, 651 (6th Cir. 2001).

Finally, a district court's decision not to grant a downward departure from the applicable Sentencing Guidelines range is not appealable unless the district court mistakenly believed that it lacked the authority to depart from the guidelines. *United States v. Henderson*, 209 F.3d 614, 617 (6th Cir. 2000).

**B. The district court did not err in refusing to suppress the evidence obtained at Gould's residence and in declining to dismiss the indictment based upon the government's use of Daniels's allegedly immunized testimony**

Daniels argues that the district court should have suppressed the evidence obtained in the March 1996 search of Gould's residence. She also contends that the indictment should have been dismissed because the government presented Daniels's 1993 grand jury testimony to the grand jury that issued the indictment in the present case. The district court assumed for the sake of argument that Daniels was granted immunity prior to her 1993 grand jury testimony, but concluded that the government had established sufficient independent sources to support both the search warrant and the indictment without reference to Daniels's prior testimony.

As an initial matter, we have considerable reservations about the scope of any immunity that Daniels was granted, about whether any promises that were made to her were broken, and about whether dismissal of the indictment, rather than a contractual remedy, would be appropriate if a breach occurred. Daniels was not granted statutory immunity under 18 U.S.C. § 6002, so the protections that are provided to a witness who testifies pursuant to such immunity are not applicable. *United States v. Turner*, 936 F.2d 221, 223-24 (6th Cir. 1991) (noting that unlike informal immunity, a grant of statutory immunity pursuant to 18 U.S.C. § 6002 "assures a witness that his immunized testimony will be inadmissable in any future criminal proceeding, as will be any evidence

**D. The district court did not err in refusing to grant a new trial based upon alleged jury irregularities**

Both Daniels and Orlando argue that they presented sufficient proof of extraneous influences on the jury to require a new trial. They specifically focus on the testimony that newspaper articles were brought into the jury room, that one or more jurors mentioned *The Tennessean* website, that one of the jurors heard a discussion of "The Chamber," that several jurors mentioned having watched "Sin City," and that Martin, the foreperson of the jury, related that several police officers he knew had told him that clients at Dawn's received more than massages. According to the defendants, these incidents denied them an indifferent, impartial jury.

The Sixth Amendment's right to trial by jury "is designed to ensure criminal defendants a fair trial by a panel of impartial, indifferent jurors." *United States v. Davis*, 177 F.3d 552, 556-57 (6th Cir. 1999) (internal quotation marks and citations omitted). Four principles govern claims of extraneous, prejudicial influences on a jury:

> (1) when a defendant alleges that an unauthorized contact with a juror has tainted a trial, a hearing must be held; (2) no presumption of prejudice arises from such a contact; (3) the defendant bears the burden of proving actual juror bias; and (4) juror testimony at the "*Remmer* hearing" is not inherently suspect.

*United States v. Zelinka*, 862 F.2d 92, 95-96 (6th Cir. 1988) (referring to *Remmer v. United States*, 347 U.S. 227 (1954)).

After conducting a five-day *Remmer* hearing, the district court concluded that the defendants failed to prove that any extraneous information led to juror bias against them. The court based its decision on its findings that Wade (the juror who spoke with Orlando after the trial) lacked credibility, that no corroboration existed for most of Wade's allegations, and that the allegations made by Wade that were corroborated did not prejudice the defendants.

that suppression of the evidence or dismissal of an indictment are not required to remedy a violation of § 6103).

Congress has provided civil and criminal remedies for violations of § 6103, but no statutory provision requires the exclusion of evidence so obtained. 26 U.S.C. § 7431 (establishing a private right of action for civil damages against the United States as a remedy if a federal officer knowingly or negligently violates § 6103); 26 U.S.C. § 7213(a)(1) (providing that the willful disclosure by a federal officer of any return or return information is a federal crime); 26 U.S.C. § 7213A (making it unlawful for any federal officer or employee to inspect records in violation of § 6103).

Where Congress has provided a particular remedy for the violation of a statute, that remedy, and not judicially imposed remedies, should apply in the absence of a constitutional violation. *United States v. Ware*, 161 F.3d 414, 424-25 (6th Cir. 1998) (holding that the exclusionary rule did not apply to alleged violations of 18 U.S.C. § 201(c)(2), which establishes criminal penalties for paying a witness to testify, noting that "[g]enerally, when Congress has designated a specific remedy for violation of one of its acts, courts should presume that Congress has engaged in the necessary balancing of interests to determine the appropriate penalty"). The exclusionary rule is therefore inapplicable to the present case, because any purported violation of § 6103 did not infringe upon Daniels's constitutional rights. *See id.* at 424 ("While the exclusionary rule has been applied to remedy statutory violations, these cases typically implicate underlying constitutional rights such as the right to be free from unreasonable search and seizure.") (citations omitted).

For these reasons, we conclude that the district court did not abuse its discretion in denying Daniels's motion to suppress the evidence obtained as a result of Runkle's gaining access to the tax return information in question, including the records found at Gould's residence.

obtained by prosecutors directly or indirectly as a result of the immunized testimony"). In contrast, where a prosecutor assures a grand jury witness that he or she will be immune from prosecution based upon the witness's testimony before the grand jury, the promise is contractual and only binds the parties who are privy to the original agreement. *Id.* at 223 (concluding that "the 'immunity' the Turners received in the Southern District of Florida was nothing more than a promise on the part of the federal prosecutor that they would not be charged in that district and that their testimony would not be disseminated to other government agencies").

Although Daniels claims that CID Agents Bolton and Elam told her that her testimony would be immunized as long as it was truthful, neither agent conducted the investigations into her criminal activities after 1993. AUSA Hester, moreover, explicitly refused to make any promises about potential prosecutions for Daniels's future illegal actions. Finally, contractual remedies govern if a breach of a grant of informal immunity occurs. *Id.* at 224 (noting that "[p]resumably, the Turners would have normal contractual remedies available to them if the federal prosecutor breached his promise").

Despite these reservations, we will adopt the district court's assumption (without deciding) that the government granted Daniels immunity prior to her 1993 grand jury testimony. Our review is therefore limited to determining whether the district court's conclusion that the government established independent bases for proceeding with its investigation and obtaining the search warrant and indictment against Daniels was clearly erroneous.

The Supreme Court's decision in *Kastigar v. United States*, 406 U.S. 441 (1972), provides the applicable framework for evaluating a claim that the government used immunized testimony to secure a conviction. *United States v. Bartel*, 19 F.3d 1105, 1112 (6th Cir. 1994) (applying *Kastigar* to evaluate the defendant's contention that the indictment against him should have been dismissed because it was obtained by using immunized testimony). In *Kastigar*, the

Court explained that the federal immunity statute's prohibition against the use and derivative use of compelled testimony "provides a comprehensive safeguard, barring the use of compelled testimony as an investigatory lead, and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." 406 U.S. at 460 (internal quotation marks and citation omitted). If an individual demonstrates that his or her testimony was obtained under a grant of immunity, the government must satisfy "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." *Id*. at 461-62.

The testimony in the *Kastigar* hearing revealed that CID Agent Runkle's investigation began after he met with Dr. Feldman in 1995, alerting him to the allegations that Daniels was operating a prostitution business and concealing her income from the IRS. Although Runkle reviewed Daniels's 1993 grand jury testimony in the early stages of his investigation, Runkle considered that testimony "stale." Runkle also spoke with CID Agent Bolton and with Sergeant Blakely of the Nashville Metropolitan Police Department, where he learned that Dawn's was functioning as a front for prostitution.

Through his discussions with Bolton, Special Agent Mike McElroy, and his review of advertisements that appeared in magazines, Runkle discovered that businesses such as Dawn's receive payment by credit cards. He also spoke with a representative from First Premier Bank in Sioux Falls, South Dakota to confirm that Daniels had a credit card merchant account. Furthermore, Runkle reviewed the IRS Civil Division's files concerning Daniels and learned additional information about Dawn's use of credit cards, gained access to its cancelled checks, and discovered the location where its business records were kept.

Based upon this testimony, we do not believe that the district court erred in concluding that Runkle had several independent sources for beginning his investigation into

Daniels's activities, for obtaining the March 1, 1996 search warrant, and for his testimony before the grand jury in 1998. Runkle might have used Daniels's 1993 grand jury testimony to corroborate Dr. Feldman's allegations, and the indicting grand jury apparently heard portions of such testimony, but neither of these uses violates any immunity that Daniels contends she had. *See Bartel*, 19 F.3d at 1113 (noting that Bartel's contention that his compelled grand jury testimony might have been considered by the grand jurors that issued his indictment as corroboration for other evidence lacked merit because the government satisfied its burden of proving that the evidence presented to the grand jury was derived from legitimate, independent sources). We therefore conclude that the district court's determination that the government established independent sources for the search warrant affidavit and the indictment was not clearly erroneous.

**C.   The district court did not err in refusing to suppress the evidence obtained at Gould's residence based upon information obtained from Daniels's civil tax files**

The second basis for Daniels's motion to suppress the evidence obtained at Gould's residence is her contention that CID Agent Runkle obtained her civil tax files in violation of federal law. This argument relies upon the required confidentiality of taxpayers' tax returns. 26 U.S.C. § 6103(a) (providing that "[r]eturns and return information shall be confidential" and shall not be disclosed except as authorized by federal law).

We need not decide whether a violation of § 6103 occurred, because even assuming that Runkle obtained Daniels's tax files without following the procedures set forth in § 6103, suppression of the evidence is not the appropriate remedy. *Nowicki v. Comm'r of Internal Revenue*, 262 F.3d 1162, 1163 (11th Cir. 2001) (holding that a violation of § 6103 does not require the application of the exclusionary rule); *United States v. Michaelian*, 803 F.2d 1042, 1050 (9th Cir. 1986) (holding