NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0484n.06

No. 08-4496

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Aug 06, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Northern |
| JEFFREY T.CLARK, | ) | District of Ohio |
| | ) | |
| Defendant-Appellant. | ) | |

Before: BOGGS, ROGERS, and COOK, Circuit Judges.

BOGGS, Circuit Judge. Jeffrey Clark was arrested after a kilogram of cocaine switched hands in an Applebee's parking lot. He was later convicted of conspiracy to possess and distribute cocaine, cocaine base, heroin, and marijuana, in violation of 21 U.S.C. §§ 841(a) and 846, and possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a). For these crimes, Clark was sentenced to 108 months of imprisonment. In *United States v. Clark*, 254 F. App'x 528 (6th Cir. 2007), we affirmed his convictions but vacated his sentence, holding that the district court had failed to explain the factual basis for its conclusion that Clark was responsible for 3.5 to 5 kilograms of cocaine. On remand, the district court adhered to its original drug-quantity calculation but reduced Clark's sentence to 98 months.

Clark now appeals his sentence for the second time, arguing that the district court again erred in determining that he should be held accountable for 3.5 to 5 kilograms of cocaine. Additionally, he argues that his sentence was procedurally unreasonable because the district court neglected to

No. 08-4496
United States v. Jeffrey Clark

consider a number of the arguments in his sentencing memorandum. For the following reasons, we affirm Clark's sentence.

I

In deciding Clark's first appeal, we delineated the facts underlying his two convictions as follows:

On March 10 or 11, 2003, Mark Denomy, a police officer from Oregon, Ohio, on assignment with the Drug Enforcement Agency ("DEA"), received word from a jailhouse informant that Adrian Maldonado was a supplier of drugs. Undercover Agent Denomy contacted Maldonado and agreed to purchase a kilogram of cocaine at a Meijer store on March 13. Around 8:30 P.M. on that day, Denomy met Maldonado inside Meijer, and arranged to meet in the parking lot to exchange the cocaine. Eventually, a gray Dodge Dakota pulled up alongside Denomy's vehicle and dropped Maldonado off. Denomy could only see that a white male was driving the vehicle. Maldonado sold Denomy approximately one kilogram of cocaine, agreeing that Denomy could pay him the next day. Upon receiving the cocaine, Denomy returned directly to the Oregon Police Department. Denomy continued a relationship with Maldonado, resulting in the later controlled purchase of other drugs, including a pound of black tar heroine on April 22 and five kilograms of cocaine on May 2. Maldonado was finally arrested and then charged on October 6, 2004.

Also on the 13th, Agent Mark Apple, among other officers, provided surveillance and security for Denomy. Agent Apple was employed with the Ohio Attorney General's office, Bureau of Criminal Investigation. He determined from the Dodge Dakota's license number that it was from a leasing company in Toledo. After Denomy had completed his transaction and left the scene, Apple observed what appeared to be a second drug transaction between the occupants of the Dakota and the occupants of another vehicle in the nearby Applebee's parking lot. After that second transaction and with the knowledge that Maldonado lived in Fremont, Ohio, Apple and Officer St. Clair of the Ottawa County drug task force headed toward Fremont. Apple alerted the Fremont police that they were attempting to locate the Dakota. Apple, accompanied by a local Fremont police officer, eventually spotted the vehicle on State Street and "called out a lane violation to the uniformed [local] officers who made the stop." Defendant Clark was driving. Local officers found a small amount of loose cocaine in the car with Apple observing the stop from down the street. Maldonado was released, but Clark was taken into custody. In the vehicle, the officers found a police scanner set to local police frequencies and a Floyd County,

Kentucky sheriff's badge.  The Floyd County sheriff's office denied knowing of Clark or Maldonado.

Adrian Maldonado testified at Clark's trial, subsequent to Maldonado entering a guilty plea on drug/conspiracy charges but before being sentenced himself.  His plea was contingent upon his further complete cooperation with authorities.  Maldonado testified that he met Clark in 1999 or early 2000 through a mutual acquaintance and supplied Clark with "mostly cocaine" but also marijuana:

> Q. And let's talk about the cocaine.  How often would you distribute to Mr. Clark?
>
> A. Sometimes it would be on a weekly basis; if not, every two weeks or so.
>
> Q. How much would you give him at a time?
>
> A. It would range from half an ounce to a couple ounces, four ounces of cocaine.
>
> Q. And how long did this continue on until?
>
> A. I'd say for a period of about two years or so.
>
> ***
>
> Q. So if I understand you correctly, you dealt with him from sometime in '99 to 2000 all the way to 2003; is that correct?
>
> A. Yes.
>
> Q. Can you estimate how much cocaine you would have sold him during that period of time?
>
> A. Probably in excess of five keys.
>
> Q. How about the marijuana?
>
> A. Probably about 40 pounds.

>The testimony also reveals that Maldonado would sometimes front—give drugs up front for later payment—drugs to Clark.
>
>Regarding the events of March 13, Maldonado testified that, because his license was suspended, he had asked Clark to drive him to Elkhart, Indiana, to pick up two kilograms of drugs, one kilogram of which was later sold to Agent Denomy and the other sold in the Applebee's parking lot in accordance with Agent Apple's observations that evening. In exchange for the ride, Maldonado agreed to forgive some of Clark's drug debt. Maldonado also testified that Clark brought about a gram and a half of cocaine with him on the trip and used it on the way to Elkhart and back. This testimony ostensibly accounts for the cocaine residue found in Clark's vehicle by local authorities in Fremont. On cross-examination, Maldonado estimated that he himself had distributed about 100 kilograms of cocaine in the past.
>
>Clark was convicted by a jury on both counts.

*Clark*, 254 F. App'x at 529–31.

At Clark's initial sentencing hearing, one of the main issues was the quantity of drugs for which he should be held responsible:

>Clark's counsel argued that Clark should be held responsible only for the one kilogram of cocaine sold to Agent Denomy as alleged as an overt act in Count I of the indictment. This would place Clark's base offense level at 26 under the Sentencing Guidelines. Guidelines Manual § 2D1.1(7) (Nov. 2006) (at least 500 grams but less than 2 kilograms of cocaine). The Government argued that Clark should be held responsible for seven kilograms of cocaine as recommended in the Presentence Investigation Report. This figure was derived by adding (1) the one kilogram sold to Agent Denomy; (2) one kilogram sold in the Applebee's parking lot after the sale to Denomy (Agent Apple observed the transaction, though Maldonado testified as to the quantity); and (3) five kilograms based on the testimony of Maldonado that he had supplied Clark with "in excess of five keys" over the course of their relationship. Holding Clark responsible for seven kilograms of cocaine would have placed him at a base offense level of 32 under the Guidelines. Guidelines Manual § 2D1.1(4) (Nov. 2006) (at least 5 kilograms but less than 15 kilograms of cocaine). The district court adopted neither party's position and found Clark responsible for at least 3.5 kilograms but less than 5 kilograms, placing his base offense level at 30. Guidelines Manual § 2D1.1(5) (Nov. 2006).
>
>After hearing argument from both parties, the judge stated: "It seems to me for a combination of reasons, which I will articulate, that the appropriate subsection of

> 2D1.1(c) is 5, which is a level 30." After commenting on letters submitted on Clark's behalf, the judge continued, "I believe my finding with regard to the level 30 disposes of the greater amount of your memorandum on sentencing, Mr. [Defense Counsel]; am I correct?" Defense counsel responded, "[t]hat's correct, Your Honor, as it relates to the 2D1.1 determination." The judge did not further elaborate on the factual underpinnings of his determination.

*Clark*, 254 F. App'x at 534 (alterations in original).

After settling the drug-quantity dispute, the district court concluded that Clark was eligible for a two-level reduction under USSG §3B1.2(b) for being a minor participant in the conspiracy. With the reduction, Clark's total offense level was 28, which, in conjunction with a Criminal History Category of III, yielded an advisory Guidelines range of 97 to 121 months. The district court selected a sentence in the middle of the range and imposed a term of 108 months.

Clark then appealed, challenging both his convictions and his sentence. As stated above, we affirmed the convictions but took issue with the district court's sentencing decision. Noting that the district court had failed to articulate any factual basis for its drug-quantity determination, we remanded for resentencing, instructing the district court to make specific findings in support of its conclusion that Clark was responsible for 3.5 to 5 kilograms of cocaine. We also stated that, "unless the sentencing judge finds Clark responsible for an amount other than at least 3.5 kilograms but less than 5 kilograms, there is no need to revisit § 3553(a) on remand." *Clark*, 254 F. App'x at 536.

At Clark's second sentencing hearing, the district court revisited its drug-quantity determination, ultimately readopting its original conclusion. In addition, the district court found, of its own volition, that Clark's criminal history had been overstated at his initial sentencing hearing. The district court opined that, while Clark's criminal history score had been accurately calculated, he had received several criminal history points for relatively minor offenses. Subtracting those

points, the district court reduced Clark's Criminal History Category from III to II, which resulted in an advisory Guidelines range of 87 to 108 months. The district court picked once more from the middle of the range, imposing a term of 98 months.

This appeal followed.

## II

### A

Clark first argues that the district court failed—yet again—to "set forth the factual basis for any determinations regarding quantity of drugs." *Clark*, 254 F. App'x at 539. This time, however, he is wrong.

In Clark's initial appeal, our principal concern was that, "[w]hile the [district court] might reasonably come to the conclusion that Clark is responsible for between 3.5 and 5 kilograms of cocaine, [it] did not set forth any basis for actually doing so." *Id.* at 535. Given the absence of any specific findings whatsoever, as well as the fact that the amount of cocaine attributable to Clark was in dispute, we held that the district court's drug-quantity determination was insufficient under Federal Rule of Criminal Procedure 32(i)(3)(B), which requires sentencing courts to rule on any disputed portion of the presentence report that is material to the sentencing decision. *Clark*, 254 F. App'x at 536; *see United States v. Orlando*, 281 F.3d 586, 601 (6th Cir. 2002) (holding that, to comply with Rule 32(i)(3)(B), a district court should "refer to particular evidence" or "present . . . more than general conclusions"). We also suggested that the district court had run afoul of our decision in *United States v. Long*, 190 F.3d 471, 478 (6th Cir. 1999), which indicates that, when

making a drug-quantity determination, a district court must set forth the evidence upon which it relies and make specific findings. *Clark*, 254 F. App'x at 535.

On remand, the district court explained its drug-quantity determination as follows:

Let me first address the issue of drug quantities. It appears to me fairly simple to arrive at the drug quantities, which the [c]ourt did at the original sentencing of Mr. Clark. And here is the way in which I did it and failed to properly articulate it on the record. As I recall the evidence and testimony adduced at trial, Mr. Clark sold one kilogram to an undercover agent. An additional sale of one kilogram was witnessed by the agents while he was under surveillance at the Applebee's parking lot; he was with Maldonado. That accounts for two kilograms. Adrian Maldonado testified with respect to at least, as I remember it, at least an additional five kilograms of transactions in conjunction with him; that is, between himself and Mr. Clark. That would go to seven. While the [c]ourt is not bound by the jury's answer for *Apprendi* purposes, which was under the burden of proof of beyond a reasonable doubt, they concluded at least 500 milligrams [sic] of cocaine but less than five kilograms of cocaine. I, because of his involvement and his plea agreement, credited Mr. Maldonado's testimony for purposes of sentencing. My finding by a preponderance of the evidence was that somewhere between an additional 1.5 and three kilograms can be attributed under that preponderance standard to this defendant, Jeffrey Clark. While I did find, as did the jury in part, Adrian Maldonado's testimony credible, I will not accept it to the full extent that the government wishes me to and will find that the drug quantities are at least 3.5 kilograms but less than five kilograms.

Reviewing de novo, *see United States v. White*, 492 F.3d 380, 414 (6th Cir. 2007), we find that the district court's explanation satisfies the requirements of Rule 32(i)(3)(B). To comply with that rule, "the district court must *actually find facts*." *White*, 492 F.3d at 416. "This strict requirement helps to ensure that defendants are sentenced on the basis of accurate information and provides a clear record for appellate courts, prison officials, and administrative agencies who may later be involved in the case." *United States v. Tackett*, 113 F.3d 603, 613–14 (6th Cir. 1997).

Here, the district court has made the requisite findings. It explicitly found that Clark was responsible for (a) 1 kilogram of cocaine sold to an undercover agent; (b) 1 kilogram of cocaine sold

in an Applebee's parking lot; and (c) an additional 1.5 to 3 kilograms of cocaine that Clark obtained over the course of his dealings with Maldonado. The district court also specified the evidence upon which it relied, namely, Maldonado's testimony. Consequently, the district court clearly met its duty to explain its drug-quantity determination. Additionally, to the extent that the decision in *Long* independently required the district court to make specific findings and set forth the underlying evidence, that requirement was also fulfilled.

B

Clark's also argues that the district court's drug-quantity determination was not supported by a preponderance of the evidence because the determination was based on a coconspirator's estimate. This argument carries no weight.

A district court's calculation of the drug quantity attributable to a given defendant is a factual determination that we review for clear error. *United States v. Presley*, 349 F. App'x 22, 31 (6th Cir. 2009) (citing *United States v. Olsen*, 537 F.3d 660, 662 (6th Cir. 2008)). At sentencing, "[a] drug quantity need only be established by a preponderance of the evidence." *United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008). If the precise amount of drugs is uncertain, it may be estimated, but the district court "must err on the side of caution." *United States v. Gardner*, 417 F.3d 541, 546 (6th Cir. 2005). In reaching its decision, the district court may rely on the testimony of a coconspirator to establish drug quantity. *United States v. Pruitt*, 156 F.3d 638, 647 (6th Cir. 1998). This court defers to a district court's decision to credit such testimony unless the decision is "without foundation." *Ibid.*

Here, the district court held Clark responsible for 3.5 to 5 kilograms of cocaine, basing its determination on Maldonado's testimony. The district court's decision to credit that testimony rests on a firm foundation: Maldonado testified under oath at Clark's trial. *See United States v. Zuleta-Alvarez*, 922 F.2d 33, 37 (1st Cir. 1990) (Statements made under oath bear "strong indicia of reliability."); *see also Clark*, 254 F. App'x at 535 n.3 ("As Maldonado's testimony is competent evidence for determining Clark's guilt beyond a reasonable doubt . . . it too is competent evidence for making a preponderance finding."). Moreover, as the district court noted, Maldonado testified pursuant to a plea agreement, which required him to tell the truth. In addition, "Maldonado's testimony was consistent with the observations of officers who witnessed the [drug transactions] on March 13," *Clark*, 254 F. App'x at 531, further buttressing Maldonado's credibility. There was thus ample reason for the district court to believe him, and therefore the district court did not err in relying upon his testimony.

It is also apparent that the district court exercised proper caution in estimating the quantity of drugs for which Clark was responsible. At trial, Maldonado testified that, over the course of their dealings, he had supplied Clark with approximately 5 kilograms of cocaine—not counting the two kilograms transferred on March 13. Because Maldonado's testimony involved an approximation, the district court decided not to hold Clark responsible for the entire amount. Instead, the district court placed the figure at 1.5 to 3 kilograms, discounting Maldonado's estimate by 40 percent. By shaving at least 2 kilograms off the total, the district court acted with due regard for the fact that Maldonado may have inflated his guess when relating the amount of cocaine he had given to Clark. *See Clark*, 254 F. App'x at 535 ("As Maldonado could have been honestly mistaken in making his

estimate, the actual determination that Clark, in total, was responsible for at least 3.5 kilograms substantially errs on the side of caution in making an estimate.").

III

Clark's final argument is that his sentence was procedurally unreasonable because the district court failed to address a number of his arguments for a lesser sentence. We disagree.

Post-*Booker*, this court reviews sentences for reasonableness. *United States v. Pearce*, 531 F.3d 374, 384 (6th Cir. 2008). "Reasonableness review has two components: one procedural, the other substantive." *United States v. Brissett*, No. 09-4244, 2010 WL 1640934, at *2 (6th Cir. April 23, 2010). A sentence is procedurally unreasonable if it is the product of a significant procedural error, such as: "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007). Likewise, a sentence is procedurally unreasonable if the district court fails to consider a defendant's arguments for a lower sentence. *See United States v. Thomas*, 498 F.3d 336, 340–41 (6th Cir. 2007).

In the present case, there is an additional wrinkle to the analysis, given the fact that Clark was resentenced under a limited remand. In Clark's first appeal, we determined that the district court had adequately considered the § 3553(a) factors before imposing Clark's initial sentence of 108 months.[1]

---

[1]That sentence was explained as being necessary to reflect "the seriousness of the crime, protect the public from further such criminal activity, and deter others from the same." *Clark*, 254 F. App'x at 538.

*See Clark*, 254 F. App'x at 536. The only significant flaw in the district court's sentencing decision was the absence of a factual explanation for the conclusion that Clark was responsible for 3.5 to 5 kilograms of cocaine. Consequently, we remanded so that the district court could "set forth the factual basis of any determinations regarding quantity of drugs." *Id.* at 539. Because the district court had already considered the § 3553(a) factors, we noted that, "unless the sentencing judge finds Clark responsible for an amount [of cocaine] other than at least 3.5 kilograms but less than 5 kilograms, there is no need to revisit § 3553(a) on remand." *Id.* at 536. Thus, it would appear that the district court was under no obligation to consider Clark's mitigation arguments, provided they were not attacks on the previous drug-quantity determination.

Assuming that the district court was under such an obligation, we must consider the district court's sentencing decision in light of the Supreme Court's analysis in *Rita v. United States*, 551 U.S. 338 (2007). In *Rita*, the Supreme Court made clear that, when explaining a sentence, "[t]he sentencing judge should set forth enough [of an explanation] to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." *Id.* at 356. "[I]f a defendant raises a particular argument in support of a lower sentence, the record must reflect that the district judge both considered the . . . argument and explained the basis for rejecting it." *United States v. Petrus*, 588 F.3d 347, 352 (6th Cir. 2009).

Clark now argues that the district court's explanation of his sentence was deficient because the district court failed to address two of his arguments for a lesser sentence. Specifically, he claims that the district court did not properly consider his argument that he deserved a lesser sentence on account of his Myellodysplastic Syndrome, a condition "commonly known as pre-leukemia."

Appellant's Br. at 22. Clark also claims that the district court "did not discuss at all the progress the defendant made while in custody," seemingly referring to his argument at sentencing that he had undergone significant rehabilitation. *Ibid.*

It is clear, however, that the district court did consider these arguments. At Clark's second sentencing hearing, the district court explicitly stated that it had "considered the defendant's presentence memorandum." The district court then articulated its reasons for rejecting Clark's arguments. With respect to his medical condition, the district court stated: "[T]he medical staff has . . . recommended to the Bureau of Prisons that Mr. Clark receive outpatient follow-up care by an oncologist to monitor his myel[l]odysplastic syndrome. I find that none of that justifies a departure or a downward variance under the applicable guideline for health." Also, with respect to Clark's purported rehabilitation, the district court stated: "Nor do I believe his post original sentencing activities do as well. I do not believe they represent anything more than a relatively intelligent young man doing what he can to better himself."[2] As a result, the district court adequately responded to Clark's arguments for a shorter sentence.

IV

For the foregoing reasons, we AFFIRM Clark's sentence.

---

[2]Of course, any discussion the district court may have made on this subject was a lagniappe for the defendant. As this court has noted, a district court charged with resentencing a defendant is "not required to consider any of [his] post-sentencing rehabilitative efforts." *United States v. Monday*, 218 F. App'x 419, 424 (6th Cir. 2007); *see* USSG §5K2.19 ("Post-sentencing rehabilitative efforts, even if exceptional, undertaken by a defendant after imposition of a term of imprisonment for the instant offense are not an appropriate basis for a downward departure when resentencing the defendant for that offense.").