DECISION AND JUDGMENT ENTRY
{¶ 1} In this appeal from a judgment of the Lucas County Court of Common Pleas, appellant, Lamar J. Porter, was convicted of the lesser included offense of murder,[1] with a firearm specification, a violation of R.C. 2903.02(B) and 2911.01(A)(1), an unclassified felony, and of aggravated robbery, with a firearm specification, a violation of R.C. 2911.01(A)(1) and 2941.145, a felony of the first degree. The trial court sentenced appellant to life in prison with the possibility of parole in fifteen years as to the conviction for murder. The court sentenced appellant to three years in prison on the for aggravated robbery, to be served consecutively to the life sentence and to a mandatory three years in prison on the firearm specification, which is also to be served consecutively.
 {¶ 2} Appellant appeals his conviction and sentence and sets forth the following assignments of error:
 {¶ 3} "I. The trial court erred by not ordering a mistrial after the jurors expressed fears about Porter's family and friends attempting to intimidate them."
 {¶ 4} "II. Appellant's right to a public trial was violated when the court ordered that the courtroom and courthouse be cleared of all spectators."
 {¶ 5} "III. Appellant's convictions were against the manifest weight of the evidence. The state offered contradictory, inconsistent and nonspecific evidence as to the key elements of the offenses."
 {¶ 6} "IV. The court should have granted Porter's motion pursuant to Crim.R. 29 because a rational trier of fact could not have found the essential elements of the crimes charges proven beyond a reasonable doubt."
 {¶ 7} "V. Appellant did not receive effective assistance of counsel, and this prejudicially affected his right to a fair trial."
 {¶ 8} The facts necessary to appellant's individual assignments of error shall be set forth within the body of each assignment.
 {¶ 9} Appellant's Assignment of Error No. I. asserts that the trial court abused its discretion in failing to grant his request for a mistrial. Appellant contends that the jurors could not act in a fair and impartial manner in reaching their verdict because they were informed of the fact that one of the jurors was "intimidated" by some spectators during a lunch break. That juror then spoke with some of the other jurors about the incident. Specifically, "Juror No. 5" told two other jurors who went to lunch with her that one person in a group of spectators standing near the stairs said, "remember their faces" when she and the two other jurors passed by. Juror No. 5 took this mean that the group should remember the faces of the jurors and indicated that she was frightened. When Juror No. 5 and the two other jurors returned to the jury room after lunch, they mentioned the incident to some of the other jurors.
 {¶ 10} When the trial judge learned about the incident, he engaged in a private, individual voir dire with each juror, and gave both the prosecution and appellant the opportunity to question each juror. Many of the jurors were aware of the situation. Almost all of the jurors claimed that the statement made by one member of the gallery did not frighten them. All of the jurors, and alternates, indicated that they would be able to decide the case solely upon the evidence and/or in a fair and impartial manner. After the trial court completed its voir dire of each member of the jury, appellant moved for a mistrial. The trial court denied the motion, finding that each juror, including the alternates, was "not tainted by the incident that occurred at lunch."
 {¶ 11} Generally, when a trial court learns that there has been an improper outside communication with a juror, the court may hold a hearing in order to determine whether the outside communication biased the juror. State v. Hessler,90 Ohio St.3d 108, 1211-22, 2000-Ohio-30. However, the court is not required to hold an evidentiary hearing in compliance with Remmer v.United States (1954), 347 U.S. 227. Id. at 121 (Citations omitted.). Further, the burden is on the complaining party to establish actual prejudice. Id. (Citations omitted.) See, also, UnitedStates v. Orlando (C.A. 6, 2002), 281 F.3d 586, 597, citingUnited States v. Zelinka (C.A. 6, 1988) 862 F.2d 92, 95-96. In cases where the investigation of outside influences on jurors is necessary, a trial judge has broad discretion in dealing with the contact and in determining whether a mistrial should be declared.State v. Phillips (1995), 74 Ohio St.3d 72, 89. In order to demonstrate that the trial court abused that discretion, an appellant must show that the court's decision was arbitrary, unreasonable, or unconscionable. State v. Xie (1992),62 Ohio St.3d 521, 527.
 {¶ 12} As applied to the present case, appellant failed to demonstrate that there was any actual bias to his cause. The trial judge held an individual hearing with each juror and alternate in which he questioned each in order to ascertain the effect on each individual of the comment made to Juror No. 5. While two jurors expressed fear, one of those jurors stated that her fear arose from being on the jury, not from the statement made by a spectator to Juror No. 5. To repeat, both of these jurors, as well as the other members of the jury and the alternates, told the judge that they would base their decision on the evidence offered at trial and could be fair and impartial in reaching that decision. "A juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by a trial court." Id. (Citation omitted.). Accordingly, we find that the trial court did not abuse its discretion, and appellant's Assignment of Error No. I is found not well-taken.
 {¶ 13} In Assignment of Error No. II, appellant maintains that by excluding all spectators from viewing the remainder of his trial, the court below violated his constitutional right to a public trial. We disagree.
 {¶ 14} The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." This right was made applicable to the States by the Fourteenth Amendment. Article I, Section 10, of the Ohio Constitution also guarantees an accused the right to a public trial. Nevertheless, "the right to a public trial is not absolute and an order barring spectators from observing a portion of an otherwise public trial does not necessarily introduce error of constitutional dimension." Statev. Whitaker, 8th Dist. No. 83824, 2004-Ohio-5016, at ¶ 11 (Citations omitted.). Our review of a trial court's decision to close a courtroom to prevent intimidation by spectators is whether the trial court abused its discretion. State v. Powell,
9th Dist. No. 20067, 2001-Ohio-14, citing State v. Bayless
(1976), 48 Ohio St.2d 73, 109. Further, the failure to object to closing of the courtroom constitutes a waiver of the right to a public trial. Whitaker, at ¶ 13.
 {¶ 15} Here, the trial court closed the courtroom prior to closing arguments as a result of the incident that happened during the recess for lunch and because a "couple of the jurors" indicated that they would be more comfortable during closing arguments and jury instructions without any spectators. Appellant did not object to the closing of the courtroom; therefore, he waived his right to a public trial. In fact, prior to the trial court's voir dire of the jury members, appellant's trial counsel stated that he thought it was a good decision under the circumstances. Moreover, the trial court's decision to close the courtroom was not arbitrary, unreasonable, or unconscionable. A few of the jurors did express some fear due to the remark made by one of the spectators to Juror No. 5. Consequently, the court below closed the courtroom to make them feel more at ease. Additionally, the only portions of the trial remaining were closing arguments and jury instructions. No new evidence was presented to the jury. We therefore conclude that appellant was not deprived of his constitutionally guaranteed right to a public trial, and appellant's Assignment of Error No. II is found not well-taken.
 {¶ 16} In his Assignment of Error No. III, appellant urges that the jury's verdict is against the manifest weight of the evidence. The following consistent, specific, and uncontradicted facts are pertinent to our disposition of appellant's Assignment of Error No. III.
 {¶ 17} On February 1, 2004, Antuan Rayford, also known as "Quanny" or "Twanny," and William Thomas were selling crack cocaine at a known crack house located at 2425 Putnam Street in Toledo, Lucas County, Ohio. Appellant, whose street name is "Little L" or "L" or "L Dog," and who also was a crack dealer, arrived at the Putnam Street address during the early morning hours of February 2, 2004. Individuals who were either living at that residence or were staying there while they used crack cocaine were Jamilah Hood, Ramone Brown, Allen Wayne Smith, Robin Mathis, and the victim, Ronald Bryant.
 {¶ 18} The undisputed testimony at trial revealed that Ronald Bryant arrived at 2425 Putnam at some point prior to 4:30 a.m. on the morning of February 2, 2004, and purchased three "rocks" of crack cocaine for $25. He, Mathis, and Smith were smoking the crack in an upstairs bedroom. Hood was sleeping in a bedroom directly across from the room occupied by Bryant and Mathis. After smoking the three rocks, Bryant purchased more crack from Rayford.
 {¶ 19} Testimony from Rayford and Thomas disclosed that Rayford brought a nine millimeter firearm to the crack house and that the three dealers sat around a table in the kitchen passing the weapon around as they talked. After the second sale of crack to Bryant, Rayford, who had seen Bryant pull money from his pants pocket, suggested that the three rob Bryant. At first, appellant and Thomas thought that Rayford was joking, but after he told them that they could get a "hundred apiece," they agreed to rob Bryant.
 {¶ 20} In order to keep Smith from interfering, he was told that Rayford thought he saw an undercover police vehicle on the street. Smith was asked to go "check on it." After Smith left the house, the three started up the stairs. Rayford did not want to hold the nine millimeter so he handed it to Thomas, who, in turn, gave the weapon to appellant. When the three men entered the bedroom, they "rushed" Bryant, and Rayford pinned him down on a couch. Appellant stood over the victim with the nine millimeter, and Thomas grabbed for the money in Bryant's pocket. Because Bryant was struggling, Rayford told appellant to hit their victim, and appellant "pistol whipped" Bryant's head. According to Rayford and Thomas, Bryant was begging them not to hurt him/not to shoot him.
 {¶ 21} Subsequent to snatching the money, and ripping Bryant's pocket in the process, Thomas told the others, "[C]ome on, I got the money." and ran down the stairs. He heard the sound of two gunshots behind him, but kept running and went out the back door.[2] Rayford testified that after Thomas said that he had the money, he (Rayford) told Bryant to stay on the couch until they left. According to Rayford, he stepped back and turned to run down the stairs when he heard appellant tell him to watch out and then heard the first shot. When Rayford tried to get back in the room, he heard the second shot. He opened the door and saw Bryant on his knees with his head against appellant's stomach. Rayford testified that he then grabbed appellant, who still had the gun in his hand. The two ran down the stairs, through the kitchen, and out the back door.
 {¶ 22} Jamilah Hood provided the following relevant testimony. She was sleeping in her bedroom, which is about five feet away from the room where Bryant was killed, when she was awakened by the sound of voices. Hood was able to hear Rayford's voice saying, "Give me the money." She also heard Bryant say: "Here, you can have the money. Don't shoot me." Next there was a loud gunshot and Rayford said, "Ahh L." There was a second gunshot and then the sound of people running down the stairs. Hood knew that "L" was one of appellant's street names. Hood waited, and eventually Mathis came to Hood's room. When Hood opened her door, she saw a body lying on the floor of the room that was directly across from her room. When he learned of the shooting, Smith contacted the police.
 {¶ 23} In the meantime, Rayford and Hood left the scene in Thomas' car. Appellant fled on foot. However, Rayford decided that he should retrieve the nine millimeter from appellant so that he could break the firearm down into parts and distribute them in various street sewers. The pair then looked for and found appellant and obtained the weapon, which Rayford subsequently took apart. He threw those parts into different street sewers. After he was arrested, Rayford led police officers to these sewers. The officers were able to recover some of the parts, most importantly, the barrel and the grip plate (or grip) of the nine millimeter. Both Rayford and Thomas, who were 17 at the time that Bryant was robbed and shot, agreed to be bound over for prosecution as adults on lesser charges, to plead guilty to those charges, and to testify against appellant.
 {¶ 24} At appellant's trial, Cynthia A. Beisser, M.D, a deputy coroner, testified that Bryant was shot in the neck and the right shoulder by someone who was standing above and over the victim and shooting downward. She stated, to a reasonable degree of medical certainty, that Bryant died as the result of the gunshot wounds. She also averred that one of the abrasions on the victim's forehead displayed the same linear pattern that was on the grip plate that was also found in a sewer pointed out by Rayford and identified as part of the weapon used to kill Bryant.
 {¶ 25} In his testimony, David Cogan, a forensic science specialist who works in the Toledo Police Crime Lab, was able to find a nine millimeter of the same model as that used to kill Bryant. He took that gun apart and put it back together inserting the barrel of a gun retrieved from one of the sewers that Rayford indicated contained parts of the weapon used in the murder and robbery of Bryant. After test firing that weapon, Cogan compared the microscopic markings on the bullets fired from that gun to the markings on a bullet taken from Bryant's body. Cogan testified that, to a reasonable scientific certainty, the bullets from the test firing and the bullet from Bryant's body were fired from the same barrel.
 {¶ 26} Appellant contends that the jury verdict in this cause is against the manifest weight of the evidence because some of the evidence offered at trial was contradictory, was derived from unreliable sources, was nonspecific, and was inconsistent with the forensic evidence. Appellant also maintains that the evidence offered at trial failed to establish the element of intent required under R.C. 2903.02. Specifically, appellant claims that the prosecution did not demonstrate that he purposely caused Bryant's death during the course of an aggravated robbery.
 {¶ 27} A challenge to the manifest weight of the evidence questions whether the prosecution has met its burden of persuasion. State v. Thompkins (1997), 78 Ohio St.3d 380, 390. When considering an appellant's claim that the conviction is against the weight of the evidence, an appellate court sits, in essence, as a "`thirteenth juror' and [may] disagree with the fact finder's resolution of the conflicting testimony."Thompkins at 387, quoting Tibbs v. Florida (1982),547 U.S. 31, 42. However, as to conflicting testimony, we cannot find that a conviction is against the manifest weight of the evidence simply because the trier of fact believed the prosecution's witnesses. State v. Middleworth, 9th Dist. No. 05CA0016,2006-Ohio-12 at ¶ 11. Finally, we can reverse a judgment of conviction only if it appears that the jury, in resolving conflicts in the evidence, "`clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Thompkins,78 Ohio St.3d at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172,175.
 {¶ 28} We agree with appellant to the extent that there was some conflicting evidence offered in the case before us. Appellant's trial counsel took full advantage of these contradictions and inconsistencies to impeach the credibility of the prosecution's witnesses at trial. Nonetheless, as pointed out by the state, the crucial facts of this case (as set forth infra) that prove, beyond a reasonable doubt, that appellant caused the death of Ronald Bryant as a proximate result of the commission, committing, or attempting to commit an offense of violence, in particular, aggravated robbery, a felony of the first degree, are consistent and uncontradicted. See R.C. 2903.02(B)[3] and R.C. 2911.01(A)(1). Accordingly, we conclude that the jury did not clearly lose its way in this cause thereby creating such a manifest miscarriage of justice that [appellant's] conviction must be reversed and a new trial ordered. Appellant's Assignment of Error No. III is found not well-taken.
 {¶ 29} In Assignment of Error No. IV, appellant argues that the trial court erred in denying appellant's Crim.R. 29(A) motion for acquittal because the evidence offered at trial was inconsistent as to the timeline of events and was, in general, contradictory and vague. Appellant also asserts, once again, that the essential mental state of culpability, to wit, purposely, was not proven beyond a reasonable doubt.[4]
 {¶ 30} Crim. R. 29(A) provides for a judgment of acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." Our function in such an instance is to determine whether, after viewing all the evidence in a light most favorable to the prosecution, any rational juror "could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Here, sufficient, consistent and specific evidence was offered to establish, beyond a reasonable doubt, that appellant caused the death of Ronald Bryant as the proximate result of using a deadly weapon while committing a theft offense. See R.C. 2903.02(B); 2911.01(A)(1); 2941.145, R.C.2923.11(A) (defining the meaning of "deadly weapon"); and 2923.11(B)(1) (defining the meaning of "firearm"). Appellant's Assignment of Error No. IV is, therefore, found not well-taken.
 {¶ 31} In his fifth and final assignment of error, appellant complains that his trial counsel was ineffective in the following respects: (1) counsel failed to file a motion to suppress any evidence seized at appellant's residence because a search warrant issued for the search of his home was supported by an insufficient affidavit; (2) counsel failed to cross-examine witnesses and/or to retain an independent forensic expert to support the theory that Rayford, not appellant, beat and shot Bryant; (3) counsel failed to retain an expert witness to testify to the long term effect of crack cocaine addiction on cognitive abilities; (4) counsel failed to call appellant's mother as an alibi witness; and (5) counsel failed to call witnesses to testify as to who was wearing a "Carhatt" jacket on February 1 and 2, 2004.
 {¶ 32} The United States Supreme Court devised a two prong test to determine ineffective assistance of counsel. Stricklandv. Washington (1984), 466 U.S. 668, 687. In order to demonstrate ineffective assistance of counsel, an accused must satisfy both prongs. Id. First, the defendant must show that his trial counsel's performance was so deficient that the attorney was not functioning as the counsel guaranteed by the Sixth Amendment of the United States Constitution. Id. Second, he must establish that counsel's "deficient performance prejudiced the defense." Id. The failure to prove one prong of the Strickland two-part test makes it unnecessary for a court to consider the other prong. State v. Madrigal, 87 Ohio St.3d 378, 389, 2000-Ohio-448, citing Strickland at 697. In Ohio, a properly licensed attorney is presumed competent. State v. Lott (1990),51 Ohio St.3d 160, 174.
 {¶ 33} Four of the arguments made by appellant assert that his trial counsel was ineffective for not calling various witnesses. The decision whether to call a witness is "`within the rubric of trial strategy and will not be second-guessed by a reviewing court.'" State v. Williams, 99 Ohio St.3d 493,2003-Ohio-4396, at ¶ 125, quoting State v. Treesh (2001),90 Ohio St.3d 460, 490. While the decision to call or not to call these witnesses might be debatable, it does not constitute ineffective assistance of counsel. State v. Martin, 2d Dist. No. 20610, 2005-Ohio-1369, ¶ 19. The record of this cause fails to reveal any evidence to support a claim that the failure to call the listed witnesses was not sound trial strategy; therefore, the failure to call said witnesses was not a violation of any duty that trial counsel owed to his client.
 {¶ 34} Moreover, appellant fails to show if or how the failure to call these witnesses, including appellant's own forensic expert, prejudiced his defense. All of the witnesses, including Rayford and Thomas, that presented testimony at appellant's trial were subject to cross-examination by trial counsel who pointed out the inconsistencies in their testimony and the fact that some of these witnesses might have been under the influence of crack cocaine at the time of the shooting. This witness testimony provided overwhelming evidence, both direct and circumstantial, of the fact that appellant was the individual who, on February 2, 2004, caused the death of Bryant during the course of an aggravated robbery. Thus, we cannot deem trial counsel ineffective in this respect.
 {¶ 35} Appellant's last contention related to ineffective assistance of counsel is, at best, confusing. We presume that he is claiming that trial counsel breached his duty to his client by failing to file a motion to suppress any evidence seized from appellant's residence as the result of a search that was based on a search warrant supported by an invalid affidavit. However, the search warrant itself is not in the record of this cause. Additionally, the only demonstrative evidence admitted at appellant's trial included parts of the nine millimeter firearm found in different street sewers, autopsy photographs, photographs of the nine millimeter and the striations made by bullets shot from the barrel of that gun, shell casings, photographs of the murder scene, and a letter written by Rayford to appellant after their arrest and while they were in jail. There is no evidence in the record before us that any of these items were obtained as the result of a search of appellant's residence. Therefore, trial counsel did not abrogate any duty to his client by declining to file a motion to suppress this evidence due to an invalid search warrant. And, we reiterate, that due to the overwhelming evidence of appellant's guilt offered at his trial, his defense was not prejudiced by trial counsel's allegedly deficient performance. For all of the foregoing reasons, appellant's Assignment of Error No. V is found not well-taken.
 {¶ 36} On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair hearing, and the judgment of the Luca County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, J. Singer, P.J. Parish, J. concur.
[1] Appellant was acquitted on one count of aggravated murder, a violation of R.C. 2903.01(B), a felony of an unspecified degree.
[2] Although the crack dealers kept the back door boarded to prevent law enforcement from entering the crack house from the rear, Rayford also testified that you could open the door from the inside by taking the inside board off the door. Testimony also revealed that the drug dealers made their sales by means of this back door.
[3] Because appellant was found guilty of the lesser included offense of murder, the state was not required to prove, beyond a reasonable doubt, that appellant "purposely" caused the death of Ronald Bryant. cf. R.C. 2903.01(B), which sets forth the elements of felony aggravated murder, with R.C. 2903.02(B), which provides the elements of felony murder.
[4] See fn. 3.